# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MEDINA, Minor.

FOR PUBLICATION
September 13, 2016
9:10 a.m.

No. 328952
Ingham Circuit Court
Family Division
LC No. 14-001596-NA

Before: BOONSTRA, P.J., and WILDER and METER, JJ.

WILDER, J.

Respondent father appeals as of right from the trial court's order terminating his parental rights to his son, JM. The trial court cited three statutory grounds for termination, none of which respondent contests in this appeal: (1) MCL 712A.19b(3)(a)(*ii*) (desertion for 91 or more days during which custody is not sought), (2) MCL 712A.19b(3)(i) ("Parental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse, and prior attempts to rehabilitate the parents have been unsuccessful."), and (3) MCL 712A.19b(3)(n)(*i*) (parent previously convicted of CSC I "and the court determines that termination is in the child's best interests because continuing the parent-child relationship . . . would be harmful to the child"). We affirm.

## I. FACTUAL BACKGROUND

In January 2000—before JM was born—respondent pleaded guilty to first-degree criminal sexual conduct (CSC I) for forcibly raping and sodomizing his nine-year-old cousin. At that time, respondent was 18 years old. In exchange for his guilty plea, the prosecution dropped additional charges stemming from respondent's admitted sexual relationship with a 14-year-old girl. As a result of his plea, respondent spent roughly eight and a half years in prison. During that time, his parental rights to his daughter, HM, were terminated because respondent was admittedly incapable of caring for HM "physically, emotionally or financially[.]" Respondent has another son, IM, who lives in Florida.

In 2009, after respondent was paroled, he admittedly committed several parole violations—what he characterized as "some wrong decisions"—which resulted in the revocation of his parole. Specifically, respondent "broke tether," visited IM without supervision, and

-1-

allegedly engaged in gang-related activity.[1]  Consequently, respondent was returned to prison, where he served an additional year.

After he was again released from prison, respondent and petitioner mother began to date. The parties gave conflicting testimony regarding the inception, extent, and duration of their relationship.  But it is undisputed that their romantic entanglement resulted in an unplanned pregnancy, and the subsequent birth of JM in the autumn of 2011.  According to petitioner, JM was about 15 months old when petitioner learned of the factual basis for respondent's CSC I conviction.  Respondent had previously portrayed his conviction as a "Romeo and Juliet" situation involving young love—a romantic relationship between himself, when he was a teenager, and a 14-year-old family friend—but when petitioner went to the courthouse and reviewed the court file, she learned "[t]he whole truth . . . that he forcibly raped his 9-year-old cousin anally[,] vaginally[,] and orally."  The revelation left petitioner "stunned."  Realizing that respondent was "not a good father" and that the relationship would not work, petitioner ended the relationship.

Petitioner later met and began to date her current husband, Benjamin, who is a national guardsman and former sheriff's deputy.  Upon learning of petitioner's new relationship, respondent made harassing phone calls to her, threatening to kidnap JM and kill petitioner. Petitioner and Benjamin married in August 2013, forming a blended family with JM and two of his half-siblings.  Respondent thereafter began to date another woman, Monica, to whom he eventually became engaged.[2]

In December 2014, petitioner instituted this action by filing a petition seeking termination of respondent's parental rights to JM.  Among other things, petitioner alleged that, upon termination of respondent's parental rights, Benjamin would adopt JM.  Petitioner further alleged that JM lacked any bond with respondent, and would not recognize him, whereas JM regularly called Benjamin, "Dad."  Benjamin agreed that he wanted to adopt JM, explaining that he had "grown to see [JM] as [his] son," and that he wanted to provide a "solid" family setting for the child.  The trial court subsequently authorized the petition and, over respondent's repeated objections, ordered that respondent would not be permitted parenting time with JM.

---

[1] Respondent is allegedly a member of the "Latin Kings" street gang, and in the lower court he gave somewhat inconsistent testimony regarding his affiliation with that organization.  When asked at the preliminary hearing in this matter whether he had "ever been a member of the Latin Kings," respondent replied, "In a past life I've been a gang member."  But when later asked the same question at trial, respondent answered, "I have never been a member of the Latin Kings."

[2] Monica has prior convictions for numerous offenses, including two domestic assault convictions, a disorderly person conviction, and a probation violation for failure to report and failure to complete parenting classes.  Moreover, she tested positive for marijuana in 2014—a year after her own mother was forced to seek a personal protection order (PPO) against her. During the pendency of the lower court proceedings, Monica had an outstanding bench warrant for failure to pay child support in another matter.

Several months later, in March 2015, respondent filed a motion seeking to dismiss the termination petition. He argued that the trial court could not take jurisdiction over JM because the child remained in petitioner's care—a "stable, suitable," and "safe environment"—not foster care. The trial court denied respondent's motion to dismiss the termination petition, citing *In re Marin*, 198 Mich App 560, 568; 499 NW2d 400 (1993), for the proposition that "it is not necessary that the child be in foster care in order for the termination petition to be entertained." Later that same month, respondent pleaded guilty to a misdemeanor violation related to his registration as a sex offender. Respondent admitted that he had moved to a different address without duly notifying the authorities.

The matter proceeded to a bench trial regarding adjudication in July 2015. At that time, JM was three years old. Petitioner testified on her own behalf and called two additional witnesses, including her husband, Benjamin. According to petitioner, in the first year of JM's life, she "was a single parent basically." During that time, respondent remained on parole for his CSC I conviction, was subject to GPS tether restrictions, and maintained "very minimal and sporadic" contact with JM. Any contact that *did* occur was initiated by petitioner because, at that time, she believed that maintaining a parent-child relationship between JM and respondent "was the right thing to do." But during his visits with JM, respondent seemed to lack any genuine interest in spending time with the child. He "didn't want to change [JM's] diapers and do the daily things that you have to do for a baby," instead preferring to "hang out with friends" and play video games. While doing so, respondent would often consume alcohol, which violated the terms of his parole. Respondent is prone to violent outbursts, especially while drinking, and has previously admitted to being "mentally unstable." Accordingly, when respondent used alcohol, petitioner would remove JM from the situation because she "didn't want [her] son around that." After learning of the basis for respondent's CSC I conviction, petitioner stopped initiating visits altogether, except for one she arranged as a pretense to retrieve some of JM's personal items from respondent's home. After that visit, more than two years previous, respondent had no contact with JM.

Petitioner further testified that, at the time of trial, she and JM had been living with Benjamin for several years. She described Benjamin as "a great father to [JM]," who had "been there," and who JM loved.[3] Conversely, respondent was then residing at his mother's home, along with his stepfather and Monica, all of whom have criminal backgrounds.

Although respondent's testimony painted a very different picture, and disputed most of substance of petitioner's testimony and that of her supporting witnesses, we need only note that, in deciding to assume jurisdiction over JM, the trial court repeatedly questioned respondent's credibility, while accepting that of petitioner and her witnesses. The trial court noted that respondent seemed "a poor historian regarding some pretty significant things in [his] life,"

---

[3] Benjamin also testified regarding his relationship with JM. According to his testimony, the two have "a normal father/son relationship" and a close bond. They ride bicycles together, "go fishing . . . go boating, go to the zoo, go to the park," and are "[p]retty much inseparable[.]"

further noting that petitioner mother's testimony "made more reasonable sense than [respondent] father's."

In the disposition hearing following the adjudication, after entertaining oral argument, the trial court terminated respondent's parental rights under MCL 712A.19b(3)(a)(*ii*), (3)(i), and (3)(n)(*i*). In support of its best-interests determination, the trial court concluded that JM lacked any bond to respondent and that, in any event, respondent's ability to parent JM is "unknown" because it had been more than two years since respondent saw JM. The trial court reiterated that it found petitioner and her witnesses to be credible, but it "found that [respondent] was not very credible." The trial court also concluded that JM's need for permanency, finality, and stability favored termination, particularly in light of the fact that JM views Benjamin as his father, and that termination of respondent's parental rights was in JM's best interests.

This appeal followed.

## II. STANDARDS OF REVIEW

"The clear error standard controls our review of 'both the court's decision that a ground for termination has been proven by clear and convincing evidence and . . . the court's decision regarding the child's best interest." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286, 296 (2009), quoting *In re Trejo*, 462 Mich 341, 347; 612 NW2d 407 (2000), superseded in part by statute on other grounds as recognized by *In re Moss*, 301 Mich App 76, 83 (2013). "A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made." *In re LaFrance Minors*, 306 Mich App 713, 723; 858 NW2d 143 (2014). Any related statutory interpretation poses a question of law reviewed de novo, *id.*, as does the question of whether the trial court conformed to the applicable procedural rules, *In re BZ*, 264 Mich App 286, 291; 690 NW2d 505 (2004). We "must defer to the special ability of the trial court to judge the credibility of witnesses." *LaFrance*, 306 Mich App at 723.

## III. RULES OF STATUTORY CONSTRUCTION

Many of the fundamental principles of statutory construction that are relevant to this appeal were discussed in *In re MKK*, 286 Mich App 546, 556-557; 781 NW2d 132 (2009):

> Statutory language should be construed reasonably, keeping in mind the purpose of the act. The purpose of judicial statutory construction is to ascertain and give effect to the intent of the Legislature. In determining the Legislature's intent, we must first look to the language of the statute itself. Moreover, when considering the correct interpretation, the statute must be read as a whole. A statute must be read in conjunction with other relevant statutes to ensure that the legislative intent is correctly ascertained. The statute must be interpreted in a manner that ensures that it works in harmony with the entire statutory scheme. The Legislature is presumed to be familiar with the rules of statutory construction and, when promulgating new laws, to be aware of the consequences of its use or omission of statutory language[.] [Quotation marks and citations omitted.]

Similarly, "when enacting legislation, the Legislature is presumed to be fully aware of existing laws, including judicial decisions." *Alvan Motor Freight, Inc v Dep't of Treasury*, 281 Mich App 35, 41; 761 NW2d 269 (2008) (*Alvan*).

## IV. ANALYSIS

### A. INTERPRETING MCL 712A.19b(1)

Respondent argues that, under the plain language of MCL 712A.19b(1), termination was improper because JM was not in foster care or a guardianship when termination occurred. As a preliminary matter we note that, although respondent argued in the trial court that it was improper to assume *jurisdiction* over JM because the child remained in petitioner's care—not foster care—he never raised the instant issue in the trial court, i.e., whether *termination* was improper because JM remained in petitioner's care. Thus, this issue is unpreserved. See *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014). Even so, we exercise our discretion to review this issue because it "involves a question of law and the facts necessary for its resolution have been presented[.]" See *Smith v Foerster-Bolser Const, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006).

### 1. *MARIN* IS CONTROLLING

In pertinent part, MCL 712A.19b(1) provides:

Except as provided in subsection (4), if a child remains in foster care[4] in the temporary custody of the court following a review hearing under section 19(3) of this chapter or a permanency planning hearing under section 19a of this chapter or if a child remains in the custody of a guardian or limited guardian, upon petition of the prosecuting attorney, whether or not the prosecuting attorney is representing or acting as legal consultant to the agency or any other party, or petition of the child, guardian, custodian, concerned person, agency, or children's ombudsman as authorized in section 7 of the children's ombudsman act, 1994 PA 204, MCL 722.927, the court shall hold a hearing to determine if the parental rights to a child should be terminated. . . .

As respondent acknowledges in his appellate briefs, the interpretation of MCL 712A.19b(1) he asks us to adopt is directly contrary to that adopted by *Marin*, 198 Mich App at 568 (holding

---

[4] Notably, as used in § 19b(1), "foster care" is defined as "care provided to a juvenile in a foster family home, foster family group home, or child caring institution licensed or approved under 1973 PA 116, MCL 722.111 to 722.128, *or care provided to a juvenile in a relative's home under a court order.*" MCL 712A.13a(1)(e) (emphasis added). But in this context, although she is his mother, petitioner does not qualify as JM's "relative" as that term is defined by MCL 712A.13a(1)(j). Thus, respondent is correct that JM was not in "foster care" for purposes of § 19b(1) at the time of termination.

that, under a former version of § 19b(1),[5] "it is not necessary that the child be in foster care in order for the termination petition to be entertained."). Accordingly, citing in support the factors for overruling established precedent that are set forth in *Petersen v Magna Corp*, 484 Mich 300; 773 NW2d 564 (2009) (opinion of KELLY, C.J.), respondent invites us to "overturn" *Marin*.

We must decline respondent's invitation to disregard *Marin*. As a threshold matter, respondent cites the incorrect "stare decisis test"; Justice Kelly's opinion in *Petersen* is—unlike *Marin*—not binding on this Court under the doctrine of stare decisis. See *Hamed v Wayne Co*, 490 Mich 1, 34; 803 NW2d 237 (2011) (noting that the "stare decisis test set forth in *Petersen* [] is not the law of this state" because a majority of our Supreme Court refused to join Justice Kelly's opinion). Moreover, respondent fails to recognize that, unlike our Supreme Court, which has authority to overrule its previous decisions, see, e.g., *Robinson v City of Detroit*, 462 Mich 439; 613 NW2d 307 (2000), under MCR 7.215(J)(1) this Court is *bound* to follow the rule of law established by its prior published opinions, so long as those opinions were "issued on or after November 1, 1990" and have "not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals[.]" Because *Marin* was decided after November 1, 1990, and has not been reversed or modified, we are bound to follow its interpretation of MCL 712A.19b(1). Hence, respondent's change-of-law argument necessarily fails.

## 2. *MARIN* WAS PROPERLY DECIDED

Furthermore, we believe that *Marin* was properly decided, and therefore reject respondent's request that we declare a "but for" conflict under MCR 7.215(J)(2) ("A panel that follows a prior published decision only because it is required to do so by subrule (1) must so indicate in the text of its opinion, citing this rule and explaining its disagreement with the prior decision."). In support of his request that we do so, respondent argues that the *Marin* Court's interpretation of MCL 712A.19b(1) "is directly at odds with the text of the statute," further arguing that the Court intentionally ignored the plain meaning of the statutory language, instead relying on an analysis of "legislative history" to justify its holding. We disagree.

Respondent mischaracterizes *Marin*. The *Marin* Court did not ignore the statutory language at issue; rather, after reviewing such language, and concluding that § 19b(1) was equally susceptible to more than one reasonable interpretation, the *Marin* Court turned to alternative methods of statutory construction in order to discern the Legislature's intent:

> The real question to be answered is what purpose is served by § 19b(1): (1) to establish those conditions, and only those conditions, under which the probate court may terminate parental rights (i.e., when children remain in foster care) or (2) to impose an obligation upon the probate court to conduct a termination hearing upon request by a party where a child remains in foster care. While either of these interpretations would be reasonable in light of the language employed in

---

[5] In the numerous amendments of MCL 712A.19b(1) that have occurred since *Marin* was decided, the operative statutory language has remained nearly identical. Ergo, notwithstanding such amendments, we find *Marin* to have binding precedential authority here.

§ 19b(1), we are persuaded that the second interpretation is the one intended by the Legislature.

\* \* \*

While the [former interpretation set forth] above does present a reasonable interpretation of § 19b(1), that interpretation is dependent upon an assumption or conclusion that the Legislature did not intend to allow the termination of just one parent's parental rights. In looking to the text of the statute…, we are not persuaded that that assumption is correct. In § 19b(3), in setting forth the grounds that justify the termination of parental rights, the statute refers to the termination of the rights of "a parent" and in various portions of § 19b(3), the statute repeatedly makes references to "a parent" or "the parent." This use of parent in the singular, rather than consistently referring to "the parents" in the plural, suggests that the Legislature envisioned and intended that the probate court could terminate the parental rights of just one parent.

\* \* \*

When the statute is viewed in the context of providing more efficient handling of neglected children with increased emphasis on providing permanent placement, be it in the parental home or elsewhere, as soon as possible, § 19b(1) now possesses meaning independent of establishing the sole conditions under which termination of parental rights may occur.

\* \* \*

. . . .§ 19b(1) mandates that the probate court hold a termination hearing upon a petition where the child remains in foster care. Thus, delays in the permanent placement of a child in foster care cannot result from the court's unwillingness to conduct a termination hearing, it being obligated to do so upon petition. That does not mean, however, that § 19b(1) otherwise limits the conditions under which a petition to terminate parental rights may be entertained by the court. That is, while the court is obligated to hold a hearing regarding a petition to terminate parental rights where the child remains in foster care, that does not imply that its authority to conduct a hearing within its discretion regarding a petition where the child does not remain in foster care is otherwise limited.

For the above reasons, we conclude that the interpretation of § 19b(1) that is most consistent with the express language of the statute and that gives the greatest meaning to the intent of the Legislature is that advocated by petitioner, namely that the parental rights of one parent may be terminated without the termination of the parental rights of the other parent and it is not necessary that the child be in foster care in order for the termination petition to be entertained. [*Marin*, 198 Mich App at 563-564, 566-568.]

We do not find the above reasoning unsound. On the contrary, for the reasons discussed in *Marin*, we agree that the interpretation of § 19b(1) adopted in that case is consistent with both the statutory language and the underlying legislative intent.

Indeed, given the intervening passage of time since *Marin* was decided, we are afforded an advantage of perspective that the *Marin* Court necessarily lacked. The *Marin* panel could only try to anticipate what reaction, if any, the Legislature might have to the *Marin* decision. By contrast, we are able to note that, despite the interpretation of § 19b(1) that *Marin* announced, of which the Legislature is presumed to be aware, see *Alvan*, 281 Mich App at 41, and the fact that the Legislature has since amended MCL 712A.19b on 10 occasions, it has not meaningfully amended the pertinent language in § 19b(1). As such, the Legislature has, seemingly at least, implicitly approved of the *Marin* interpretation on numerous occasions.[6]

An aspect of statutory context that was left unaddressed by *Marin* further bolsters our conclusion that *Marin* was properly decided. We do not read § 19b(1) in a vacuum, heedless of context. As provided by MCL 712A.1(3), all provisions within that chapter, including § 19b(1),

> shall be liberally construed so that each juvenile coming within the court's jurisdiction receives the care, guidance, and control, *preferably in his or her own home*, conducive to the juvenile's welfare and the best interest of the state. *If a juvenile is removed from the control of his or her parents, the juvenile shall be placed in care as nearly as possible equivalent to the care that should have been given to the juvenile by his or her parents*. [Emphasis added.]

Respondent's proposed interpretation of § 19b(1) is, of course, patently inconsistent with § 1(3) immediately above. Rather than construing § 19b(1) to afford an opportunity (where practicable) for minor children to remain in their own homes during the pendency of a termination proceeding, and in the continued care of a custodial parent, respondent argues that § 19b(1) should be construed to *require* removal and placement with a foster parent or guardian as a condition precedent for termination. Respondent's proposed interpretation allows no room for trial judges to determine, on a case by case basis, whether removal is "conducive to the juvenile's welfare and the best interest of the state." It seems to require little explanation that a blanket rule requiring removal in *all* termination cases—even cases like this one, where removal

---

[6] We are mindful that, as a tool of statutory construction, the theory of legislative acquiescence is "highly disfavored" and "has been repeatedly repudiated by [our Supreme] Court because it is as an exceptionally poor indicator of legislative intent," requiring the judiciary "to intuit legislative intent not by anything that the Legislature actually enacts, but by the *absence* of action." *McCahan v Brennan*, 492 Mich 730, 749; 822 NW2d 747 (2012). Nevertheless, under the circumstances at bar, we consider the Legislature's seeming acquiescence to *Marin* not as a tool of statutory construction but, rather, as one factor, among several, supporting our decision that a "but for" conflict is unwarranted. Although the absence of an intervening amendment is not dispositive that the Legislature is satisfied by the *Marin* interpretation of § 19b(1), neither does the absence of such an amendment support respondent's argument that *Marin* deviated grossly from the provision's "clear" meaning.

would have been illogical, leading only to needless waste of time and expense—is a rule that would do violence to the best interests of our state and many of its children. Contrastingly, the *Marin* interpretation of § 19b(1) is harmonious with § 1(3).

Respondent's assertion that § 19b(1) prescribes foster care (or guardianship) as a prerequisite for termination in *all* cases is also inconsistent with the language that begins § 19b(1): "*Except* as provided in subsection (4). . . ." (Emphasis added.) The referenced subsection, § 19b(4), provides:

> (4) If a petition to terminate the parental rights to a child is filed, the court may enter an order terminating parental rights under subsection (3) at the initial dispositional hearing. If a petition to terminate parental rights to a child is filed, the court may suspend parenting time for a parent who is a subject of the petition.

Notably, unlike § 19b(1), § 19b(4) does not mention foster care or guardianship. Thus, § 19b(4) empowers trial courts to entertain a termination petition at the initial dispositional hearing regardless of whether the minor child is placed in foster care or with a guardian. As contemplated by § 19b(4), in this case respondent's parental rights were terminated at the initial dispositional hearing under various subparts of § 19b(3). We find no error in that regard.

In sum, we conclude that the *Marin* Court's construction of § 19b(1) is consistent with both the plain statutory language and the surrounding statutory provisions, particularly §§ 1(3) and 19b(4). Therefore, we decline respondent's invitation to announce a "but for" conflict regarding *Marin*.

## B. STANDING TO PETITION

Next, respondent argues that the trial court erred by failing to recognize that petitioner lacked standing, as JM's custodial parent, to file a termination petition. We disagree.

In pertinent part, MCL 712A.19b(1) provides,

> [U]pon petition of the prosecuting attorney . . . or petition of the child, guardian, custodian, concerned person, agency, or children's ombudsman as authorized in section 7 of the children's ombudsman act, 1994 PA 204, MCL 722.927, the court shall hold a hearing to determine if the parental rights to a child should be terminated. . . .

Respondent argues that, because the above provision does not specifically include the term "parent" in its list of those entitled to file termination petitions, parents lack standing to file such petitions. Thus, respondent argues, petitioner lacked standing to file the termination petition in this case.

Respondent's argument is directly contravened by established precedent:

> [W]e acknowledge that the comprehensive list of parties authorized to file a termination petition under § 19b(1) does not include the term "parent." However, given the Legislature's use of the apparently broad term "custodian" in § 19b(1),

we can discern no statutory basis for excluding a *custodial* parent from filing a termination petition under the Juvenile Code to terminate the rights of the other natural parent. The plain and ordinary meaning of "custodian" certainly encompasses a custodial parent. . . . [*In re Huisman*, 230 Mich App 372, 380; 584 NW2d 349 (1998) (footnote omitted), overruled in part on other grounds by *Trejo*, 462 Mich at 347.]

Although *Huisman* was partially overruled by *Trejo*, a close reading of *Trejo* indicates that the standing analysis from *Huisman* remains intact.[7] Accordingly, respondent's instant claim of error necessarily fails. As JM's custodial parent, petitioner had standing to file the termination petition in this case under § 19b(1).

## C. BEST-INTERESTS DETERMINATION

Finally, respondent argues that the trial court clearly erred when it found, by a preponderance of the evidence, that termination was in JM's best interests. We again disagree.

MCL 712A.19b(5) provides, "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." Although a reviewing court must remain cognizant "that the 'fundamental liberty interest of natural parents in the care, custody, and management of their child[ren] does not evaporate simply because they have not been model parents or have lost temporary custody of their child[ren] to the State,' " *Trejo*, 462 Mich at 373-374 (alterations in original), quoting *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982), "at the best-interest stage, the child's interest in a normal family home is superior to any interest the parent has," *Moss*, 301 Mich App at 89, citing *Santosky*, 455 US at 760. Thus, once a statutory ground for termination has been established by clear and convincing evidence, a preponderance of the evidence can establish that termination is in the best interests of the child. *Moss*, 301 Mich App at 86-90 ("[T]he interests of the child and the parent diverge once the petitioner proves parental unfitness. . . . Although the parent still has an interest in maintaining a relationship with the child, this interest is lessened by the trial court's determination that the parent is unfit to raise the child.").

---

[7] We recognize that *In re Hudson*, 262 Mich App 612, 614 n 1; 687 NW2d 156 (2004), ignored the *Huisman* definition of "custodian" and announced a new definition for that term, reasoning that *Huisman* "no longer carries any precedential weight" because it was "fundamentally overruled" by *Trejo*. Because we disagree, and conclude that the germane portion of *Huisman* remains valid, we follow *Huisman* as the earlier decided case. See MCR 7.215(J)(1); see also *Romain v Frankenmuth Mut Ins Co*, 483 Mich 18, 20; 762 NW2d 911 (2009) (discussing "the 'first out' rule of MCR 7.215(J)(1)"). In large part, though, the point is academic; even if we were to follow the definition of "custodian" adopted by *Hudson*, the outcome here would remain the same. As JM's custodial parent, petitioner had "the legal duties to provide financial, emotional, and physical care and protection to the child," and therefore petitioner qualifies as JM's "custodian" under the *Hudson* definition, as well. See *Hudson*, 262 Mich App at 615.

In making its best-interest determination, the trial court may consider "the whole record," including evidence introduced by any party. *Trejo*, 462 Mich at 353.

> [T]he court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (footnotes, quotation marks, and citations omitted).]

Furthermore, "the court *may* utilize the factors provided in MCL 722.23," *In re McCarthy*, 497 Mich 1035 (2015) (emphasis added),[8] which are as follows:

> (a) The love, affection, and other emotional ties existing between the parties involved and the child.
>
> (b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.
>
> (c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.
>
> (d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.
>
> (e) The permanence, as a family unit, of the existing or proposed custodial home or homes.
>
> (f) The moral fitness of the parties involved.

---

[8] See also *In re JS & SM*, 231 Mich App 92, 102-103; 585 NW2d 326 (1998), overruled on other grounds by *Trejo*, 341 Mich at 353-354 (explaining that "many, if perhaps not all, of the types of concerns about parental ability underlying the best interests factors of the Child Custody Act are highly relevant to a decision concerning whether parental rights should be terminated," and consequently, while a trial court has "no obligation to do so, it is perfectly appropriate . . . to refer directly to pertinent best interests factors in the Child Custody Act in making a determination concerning whether a parent has established that termination of parental rights is . . . in a child's best interests.").

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(l) Any other factor considered by the court to be relevant to a particular child custody dispute.

The "primary beneficiary" of the best-interests analysis "is intended to be the child." *Trejo*, 462 Mich at 356.

After duly considering several proper factors, the trial court concluded that a preponderance of the evidence supported termination. After reviewing the record, we are not left with a definite and firm conviction that the trial court made a mistake. On the contrary, the trial court's ruling seems altogether prudent. Respondent is a registered sex offender, who pleaded guilty to CSC I for forcibly raping and sodomizing his nine-year-old cousin. He is allegedly a member of the "Latin Kings" street gang and, while he denies any current membership, he acknowledges that he has been a gang member at times in the past. He also continues to associate with, and live with, others who have a substantial criminal record, including domestic violence convictions. Even during his infrequent visits with JM when the child was an infant, respondent's conduct betrayed his indifference towards the child. Moreover, respondent had little or no contact with JM for nearly two and a half years—over half of the child's life— immediately preceding termination. Due to such lack of interaction, JM has not developed a bond with respondent but is instead closely bonded to his stepfather, Benjamin, who now seeks to adopt JM. Thus, we conclude that the trial court's best-interests determination was supported by at least a preponderance of the evidence.

Respondent argues, "Knowing who one's biological father is and having a relationship with him have intrinsic value." In a utopic world, that might be true. But ours is an imperfect world, and the "value" a child derives from the parent-child relationship is not, as respondent suggests, universally positive; if it were, there would be little need for child protective proceedings. Respondent is correct that his relationship with JM is something that *ought* to have been an asset to the child, just as respondent's relationship with his nine-year-old cousin is something that *ought* to have been characterized by love and trust instead of fear and rape. Sadly, however, the record is clear that "value" for the child in this instance lies in severing all ties with respondent and beginning life anew with Benjamin and petitioner.

Affirmed.

/s/ Kurtis T. Wilder
/s/ Mark T. Boonstra
/s/ Patrick M. Meter