*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BATES, Minors.

UNPUBLISHED
December 21, 2023

No. 361566
Grand Traverse Circuit Court
Family Division
LC No. 18-004645-NA

ON REMAND

Before: GLEICHER, C.J., and K. F. KELLY and LETICA, JJ.

GLEICHER, C.J. (*dissenting*).

The majority accurately observes that our task on remand is to train our sights on whether the circuit court correctly concluded that the children's best interests were served by the termination of their mother's parental rights. I agree with the majority that "the focus of a best-interests analysis is not on the parent but the children."

But the majority opinion never engages with that principle. Instead, the majority belabors mother's past, barely mentions the children, and avoids confronting powerful evidence that mother and her children were strongly bonded. Nor does the majority explain why a less drastic and restrictive alternative to termination should have been reflexively disregarded. I would remand for a new best-interest hearing guided by the principle that termination is unwarranted where there are less restrictive permanency alternatives that safely preserve parent-child relationships.

I

Immediately after reciting that the children's needs and interests must be at the center of our attention on remand, the majority launches into a several-page-long, detailed recapitulation of mother's past transgressions. Little of this litany of mother's errors and omissions involves her more recent relationship with her children. As in the majority's initial opinion, mother's past misconduct takes center stage, while her post-rehabilitation gains (undeniable), efforts to achieve sobriety (laudable), and successes at achieving sobriety (impressive although not perfect) are overlooked. As I said before, "mother's past doomed her efforts to maintain her parental rights. Despite mother's success in constructively addressing her alcoholism and substance abuse, her

-1-

willingness to take responsibility for injuring her child, and even though her children were safely placed with their father, the court terminated her parental rights." *In re Bates*, unpublished per curiam opinion of the Court of Appeals, issued March 23, 2023 (Docket No. 361566) (GLEICHER, C.J., dissenting), p 2. On remand, nothing has changed. The majority's best-interest evaluation favoring termination, like that of the circuit court, is scripted by mother's past, flavored by a need to punish rather than to preserve enduring emotional bonds.

Reviewed through a best-interest lens, the evidence supports that terminating mother's rights to her children was unnecessary and contrary to their best interests. Because the children were safely and securely placed in their father's custody, were bonded with their mother, and mother's visits with the children were uniformly positive, termination was inappropriate on best interest grounds.

II

This Court has identified multiple considerations that should inform a court's best-interest determination. Precious few of them factored into the evaluations of either the circuit court or the majority. Regarding those that did, the circuit court advanced a one-sided view of the evidence, avoiding any mention of facts weighing against termination. The majority parrots the circuit court.

Here are 20 factors this Court has recognized as pertinent to a best-interest inquiry in a termination of parental rights setting:

- "[T]he child's bond to the parent," *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (quotation marks and citation omitted);

- "[T]he parent's parenting ability," *id*. (quotation marks and citation omitted);

- "[T]he child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home," *id*. (quotation marks and citation omitted);

- The "parent's history of domestic violence," *id*.;

- The parent's compliance with a case service plan; *id*.;

- "[T]he parent's visitation history with the child," *id*.;

- "[T]he children's well-being while in care," *id*.;

- The parent's psychological evaluation, *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009);

- The age of the child, *id*. at 129-130, and

- The parent's substance-abuse history, *In re Rippy*, 330 Mich App 350, 361; 948 NW2d 131 (2019);

- Whether the parent can provide a permanent, safe, and stable home, *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012);

- " 'The love, affection, and other emotional ties existing between the parties involved and the child,' " *In re Medina*, 317 Mich App 219, 238; 894 NW2d 653 (2016), quoting MCL 722.23(a);

- " 'The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any,' " *Medina*, 317 Mich App at 238, quoting MCL 722.23(b);

- " 'The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs,' " *Medina*, 317 Mich App at 238, quoting MCL 722.23(c);

- " 'The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity,' " *Medina*, 317 Mich App at 238, quoting MCL 722.23(d);

- " 'The permanence, as a family unit, of the existing or proposed custodial home or homes,' " *Medina*, 317 Mich App at 238, quoting MCL 722.23(e);

- " 'The moral fitness of the parties involved,' " *Medina*, 317 Mich App at 238, quoting MCL 722.23(f);

- " 'The mental and physical health of the parties involved,' " *Medina*, 317 Mich App at 238, quoting MCL 722.23(g);

- " 'The home, school, and community record of the child,' " *Medina*, 317 Mich App at 239, quoting MCL 722.23(h);

- " 'The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents,' " *Medina*, 317 Mich App at 239, quoting MCL 722.23(j);

Focusing on the factors for which record evidence exists, it is impossible to conclude that termination of mother's rights served the best interests of her children.

## A. BONDING, VISITING, PARENTING

At least five of the above factors involve a parent's relationship with a child: "the child's bond to the parent," "the parent's parenting ability," "the parent's visitation history with the child," "the love, affection, and other emotional ties existing between the parties involved and the child," and "the capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child." The children involved in this case are now ages 13 and 8; they were approximately two years younger when the evidence was gathered. Even at their earlier ages, the children were capable of reliably demonstrating the existence (or nonexistence) of a bond with their mother.

The only objective witness with first-hand knowledge of the relationship between mother and her children was Michelle Reddy, a "supportive visitation specialist" for Family Supportive Services of Northern Michigan. Reddy observed two months of weekly visits between mother and her children. Reddy testified she had no concerns regarding mother's ability to care for either of the children. Perhaps more importantly, Reddy reported both children were "always happy to see" their mother during visits, would "run to her, jump into her arms, hugs, kisses," and shared with her what they did that week. They "asked if they were going to have more visits or longer visits," and seemed to "enjoy" the longer visits over the shorter ones. She added that the boys were "always anxious to plan their next visit and know when they're going to see her, what they're going to do."

Parenting time typically occurred during dinner at a restaurant, and the children would frequently play games, bowl, read, draw pictures, and socialize with mother. Reddy observed that mother and the children "interact great together," and their conversations flowed "naturally." Mother always asked AAB for his blood sugar levels, looked at his blood sugar monitor, questioned him regarding what he had to eat that day, spoke with him about what he would have for dinner, and give him the appropriate dosage of insulin. Mother also checked his blood sugar levels later during each visit and gave him additional doses of insulin if necessary. AMB would bring a book and read to his mother, while AAB brought drawings to show her. Reddy had no concerns regarding respondent's general ability to care for the children, or for AAB's diabetes in particular. Overall, Reddy believed that it would be "detrimental" to both children if they did not see respondent and testified that the seemed genuinely attached.

Neither the circuit court nor the majority discuss this testimony. Rather, the circuit court focused on the testimony of two people who never met mother and never witnessed mother's interactions with her children. The circuit court observed that Amie Ollis, AAB's "trauma therapist," opined that AAB would not be negatively affected if his visits with his mother stopped, and that he was not benefiting from a relationship with her. Ollis, who admitted to having little information about AAB's visits with his mother except that they went well, conceded AAB was generally doing well, had "minimal stressors," and seemed "to be thriving at school." Despite having no first-hand information and no *negative* information regarding AAB's relationship and bonding with his mother, Ollis opined: "he would miss his mom, but I don't know that . . . he's benefitting from the relationship right now [or it] is providing any sustenance to his development."

The circuit court's decision to credit Ollis's testimony regarding AAB's best interests is problematic, given the limited information she had regarding that relationship. Ollis admitted the only time AAB said anything "very negative" about his mother was an expression that "he felt like he was – this is my – my interpretation was that he felt like he was responsible for his brother, like

-4-

for taking care of him, and he specifically said that he didn't like having to eat peanut butter and jelly sandwiches all of the time and he always had to make them for his brother." The circuit court apparently determined that Ollis's "interpretation" of whatever AAB said about peanut butter sandwiches supported that termination of his mother's rights would serve his best interests. In my view, Ollis offered and the circuit court endorsed a constricted and cavalier analysis of a life-critical relationship.

The circuit court noted that Deanna Couture, AMB's therapist, testified that AMB "wants to visit with his mother, but he wants an adult to come every day to check on him to make sure that he is okay." But the circuit court omitted Couture's admission that AMB did not disclose anything that would make her think an adult *should* supervise visits with his mother, that Couture had never seen AMB interact with his mother or his father, and that AMB never brought up either parent during counseling sessions. The circuit court also omitted that the resumption of parenting time did not result in any behavioral issues or "problems" in AMB's therapy.

Viewed objectively, a preponderance of the evidence demonstrated that mother and the children were strongly bonded, had exceedingly positive visits, and that mother was more than capable of attending to her sons' emotional and physical needs. The circuit court failed to acknowledge or even attempt to refute powerful evidence supporting that multiple best-interest factors centering on bonding, visiting, and parenting capabilities supported the preservation of mother's parental rights. This omission constitutes clear error.

## B. SUBSTANCE ABUSE, COMPLIANCE WITH A CASE SERVICE PLAN, MENTAL HEALTH, PSYCHOLOGICAL EVALUATION

Mother's alcoholism is the primary reason she lost her parental rights. It drove the circuit court's statutory-ground findings and the majority's conclusions the first time we considered this case. Chronic alcoholism may supply a reasonable basis for terminating a parent's rights. Here, however, the evidence supports that mother has committed to sobriety and made enormous strides in remaining substance free. Mother's recovery trajectory has not been perfect; recovering alcoholics rarely hew a flawless course. But the evidence at the termination hearing revealed mother voluntarily entered residential rehabilitation, received glowing reviews from her therapists, underwent weekly preliminary breath tests post-rehab, passing all of them, and successfully and positively addressed the conditions that led to the court's jurisdiction: her negligent care for her sons, her substance abuse, and her mental health issues.

In response to this evidence, the circuit court begrudgingly admitted mother was showing benefit regarding her substance abuse, stating: "Although [the children] have been removed for over two years, Respondent Mother is only recently showing ANY benefit with regards to her substance abuse." The court overlooked the short time available to mother to demonstrate any benefit. Mother was released from prison in October 2021, and immediately checked herself into residential rehab. Undisputed evidence established mother did well in rehab and was released in December 2021. The termination hearing occurred in March 2022, only four months later. Notably, mother was not offered a case service plan after her release from prison; she sought out and entered residential treatment on her own, a fact at least as compelling as compliance with a service plan. And the psychological evidence on which the court relied was from 2018, four years

before the termination hearing, long before mother came to grips with her alcoholism and entered rehab. More recent evidence before the circuit court was far more positive.[1]

Perhaps recognizing that the evidence of mother's efforts at recovery weighed against termination, the majority simply discounts its importance. According to the majority, "the appropriate focus . . . is not necessarily on the success of respondent's recovery, but on whether the children will have their best interests served by remaining with respondent while she undergoes recovery." There are two problems with this statement. First, mother has not suggested her children "remain with her" while she undergoes recovery. Mother's briefing and argument has acknowledged that at this point in her recovery, she seeks a *relationship* with her children, not custody. Second, mother's continuing efforts to remain substance free should be a factor that counts as highly favorable. It is in her children's best interests that mother dedicate herself to remaining sober. Recovery is a life-long process. See Substance Abuse and Mental Health Services Administration, *Recovery and Recovery Support*, available at <https://www.samhsa.gov/find-help/recovery> (accessed December 20, 2023) ("Recovery is characterized by continual growth and improvement in one's health and wellness and managing setbacks. Because setbacks are a natural part of life, resilience becomes a key component of recovery."). The circuit court clearly erred by refusing to recognize and credit mother's progress in successfully addressing her alcoholism as a fact that served her children's best interests.

## C. THE FACTORS GENERALLY INVOLVING THE NEED FOR PERMANENCY, STABILITY AND FINALITY[2]

In my original dissent, I maintained that termination of mother's parental rights was unnecessary because the children were living with their father in a safe, stable home:

> More than a decade ago, our Supreme Court observed that "a child's placement with relatives weighs against termination," and held that the fact that a

---

[1] The circuit court discounted the positive arc of mother's recovery by noting she had experienced a "relapse" a month before the termination hearing that "[s]he failed to report" to her caseworker or her recovery coach. This is not factually accurate. The caseworker testified mother *did* report that she purchased a small bottle of wine, took a couple of sips, and dumped the rest down the drain "after she realized it wasn't worth it." Mother also reported this "relapse" to her probation officer. I would characterize mother's sips of wine as a slip rather than a relapse; her actions did not reflect an abandonment of her recovery plan, but rather her recognition and acknowledgment that she needed to remain in recovery. That mother self-reported gained her no credit, either.

[2] The additional factors sharing the same theme include: "Whether the parent can provide a permanent, safe, and stable home"; "The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs"; "The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity"; and "The permanence, as a family unit, of the existing or proposed custodial home or homes."

child is living with relatives when the case proceeds to termination is a factor to be considered in determining whether termination is in the child's best interests. *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010). Placement with a relative is a critical fact, because while in a relative's care, children may be able to preserve their parent-child relationship.

The trial court considered that the children were safely placed with their father, yet found that termination of mother's rights was in their best interest. The court's decision rested on its misapprehension that mother continued to suffer from serious mental health and substance abuse problems, which the record does not support. The court found, "AMB and AAB's need for permanence, stability and finality, and the length of time both children may be required to wait for Respondent Mother to rectify her substance abuse and mental health issues weighs in favor of termination of Respondent Mother's parental rights as to AAB and AMB." The record reflects that both children expressed interest in continuing a relationship with their mother, although both had concerns about her ability to safely care for them. The trial court acknowledged that the children "enjoy spending time with their mother at visits," and that they were doing well in their father's care.

Given these undisputed facts, I am at a loss to understand why it is in the children's best interests to terminate their relationship with their mother. The facts are no different than those of routine custody matters in which one parent may not be in a present position to provide custody in his or her home. In such cases, family courts commonly rule that one parent will maintain sole or primary custody, while the other is permitted to visit under certain conditions. Such orders fulfil the goal of the Juvenile Code: they preserve family relationships. In custody cases, a parent's rehabilitation may provide a change of circumstances allowing for increased custodial rights. Similarly, a parent's decline may result in the elimination of parenting time. Unlike the termination of parental rights, which forever severs a child's relationship with a parent and the parent's family, less onerous and adversarial proceedings offer both parent and child the possibility of a positive relationship and the opportunity to repair the damage a parent has caused.

The termination of parental rights frees a child for adoption, and in that sense can bring a child permanence and stability. But the children here *have* permanence and stability with their father. There is no evidence whatsoever that the children's supervised visits with their mother harmed them; to the contrary, the evidence supports that the children enjoyed seeing and interacting with her.

Other state courts have recognized that "removing the child from the abusive parent's custody but allowing that parent restricted visitation rights can be a viable alternative to termination of parental rights when it appears that a wayward parent cannot be rehabilitated but still shares a deep and beneficial emotional relationship with his or her children." *TDK v LAW*, 78 So 3d 1006, 1011 (Ala Civ App, 2011). "In such cases, permanently depriving children of association with a parent by terminating parental rights could do more harm than good to the children." *Id*. In *Mason*, our Supreme Court voiced the same sentiment regarding

the children involved in that case, observing that they would "continue to live with their aunt and uncle—both tomorrow and indefinitely—while respondent works with the court and the DHS to establish his ability to safely parent them." *Mason*, 486 Mich at 168-169. Under the guidance of the family court, the respondent-father would "begin visiting with the children," with the aunt and uncle retaining "primary custody," potentially through a guardianship, if the court concluded that "the children should not be returned to respondent but an ongoing relationship with him—rather than termination—is in the children's best interests." *Id*. [*Bates*, (GLEICHER, C. J., dissenting), pp 5-6.]

The majority rejects that the children's placement with their father mattered because the circuit court allegedly considered that fact. The majority summarizes: "in the trial court's view, respondent's demonstrated inability to consistently maintain sobriety or care for her children compelled termination, even though the children were living with their father." But the circuit court's opinion goes no further than to reason that severing all ties with mother was necessary despite the boys' placement with their father because of mother's past "abuse and neglect" and pre-2020 substance abuse.

Like the circuit court's analysis of the statutory grounds, its determination that the children's best interests would be served by termination rested on the past, not the present. The majority's affirmance of that analysis means the conditions bringing a parent within the court's jurisdiction remain controlling at the best-interest stage, while a parent's efforts to remedy those conditions may remain meaningless. The result is that termination is in the children's best interests from the moment of adjudication if the court deems it so. The best-interest factors are merely words that may be ignored if a court decides a parent's past is her prologue, regardless that "the focus of a best interests analysis is not on the parent but the children." The message is: when placed on the best-interest scale, positive life changes simply cannot overcome past mistakes, regardless of a strong parent-child bond, solid parenting skills, joyful visits, compliance with a case service plan, mental health progress, voluntary rehabilitation efforts, and obvious love and affection shared by parent and child.

But there is a larger problem with the majority's analysis. Neither the majority nor the circuit court have explained *why* the boys' placement with their father weighs *in favor* of terminating mother's parental rights. The majority avoids any analysis of this issue at all, retreating behind the circuit court's findings.

By way of review: MCL 712A.19a(8)(a) provides that a court is not required to order the DHHS to initiate termination proceedings if a child is "being cared for by relatives." In *In re Mason*, 486 Mich 142; 782 NW2d 747 (2010), the Supreme Court emphasized the importance of relative placement in the determination of whether termination of parental rights is warranted. Countless subsequent cases, including *In re Olive/Metts*, 297 Mich App 35, 43; 823 NW2d 144 (2012), have underscored that even at the best-interests stage, placement with relatives weighs against termination.

Why did the Legislature decree that placement with relatives weighs against termination? What is it about placement with a relative that blocks an easy glide path to termination, even when

a parent is incarcerated, has a criminal record, or (as in *Olive-Metts*) has admitted to child abuse and poorly treated "psychiatric issues?"

I suggest that MCL 712A.19a(8)(a) embodies a recognition that children should not lose their connections even to imperfect parents so long as the children are safe and well cared for by a relative, including another parent. Placement with relatives can suffice to provide permanency and to keep children safe, while also allowing them to maintain critically important emotional relationships. "Much social science and legal research has concluded that terminating a legal relationship between parent and child harms the child—even when parents are so dysfunctional that they cannot raise the child." Gupta-Kagan, *The New Permanency*, 19 UC Davis J Juv L & Pol'y 1, 20 (2015). "Research has concluded that children with strong, ongoing bonds with parents, especially older children, benefit from ongoing relationships with their parents; and that children can bond closely with their caretaker without severing their relationship with parents— strong bonds with multiple caregivers is not only possible, but healthy and normal." *Id*. at 20-21.

Here, the evidence supports that at the time of the termination hearing, the children had a strong emotional attachment to their mother. They relished her company during visits, read to her, played with her, and shared the details of their lives with her. For years, social scientists have recognized that children may suffer when a parent is removed from their lives. See Beyer & Meynier, *Lifelines to Biological Parents: Their Effect on Termination of Parental Rights and Permanence*, 20 Fam L J 233, 237 (1986). An order terminating parental rights cannot magically erase that suffering.

I previously wrote:

In my view, the termination of mother's parental rights based on her past conduct was mostly punitive rather than advancing anyone's best interests. I fear that the destruction of the children's relationship with their mother will punish them, as well. These children are not abused or neglected. They are not at risk of being abused or neglected. The permanent termination of their relationship with their mother punishes them as well as mother and conflicts with their short-term and long-term best interests. [*Bates*, (GLEICHER, C.J., dissenting), p 6.]

Judges cannot magically dissolve a child's loving attachment to a parent, particularly relationships involving children of the ages of AMB and AAB, by simply signing termination orders. That is why placement with relatives weighs against termination. Here, the record contains only the speculation that severing the children's ties with their mother would serve their best interests. The strong weight of the evidence shows just the opposite, that mother's continued presence in her sons' lives benefits them.

I would reverse the circuit court and remand for an updated best-interests hearing at which the circuit court would be directed to make specific findings regarding the benefits (or detriments) of less restrictive alternatives than termination.

/s/ Elizabeth L. Gleicher