*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* UROSEVIC/JOHNSON, Minors.

UNPUBLISHED
April 21, 2026
10:15 AM

Nos. 376905; 378262
Oakland Circuit Court
Family Division
LC No. 2023-885783-NA

Before: GADOLA, C.J., and MURRAY and M. J. KELLY, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-father appeals as of right the order terminating his parental rights to his daughters, SDJ and SLJ, under MCL 712A.19b(3)(c)(*i*), MCL 712A.19b(3)(c)(*ii*), MCL 712A.19b(3)(g), and MCL 712A.19b(3)(j), and respondent-mother appeals as of right the same order terminating her parental rights to her children TLU, SDJ, and SLJ, under MCL 712A.19b(3)(c)(*i*), MCL 712A.19b(3)(g), and MCL 712A.19b(3)(j). We affirm for the reasons stated in this opinion.

## I. BASIC FACTS

In March 2023, SDJ and SLJ's elementary school requested that the police perform a welfare check. When the police arrived, respondent-father was in his truck in the driveway with the motor running. He appeared to be either unconscious or asleep. The officers unsuccessfully knocked on the window and yelled to try and wake him. They eventually opened the door and were able to get him "somewhat alert" by yelling and shaking him. The officers described respondent-father as very lethargic and disorientated in a manner consistent with narcotic usage. He was eventually taken to the hospital because of concerns that he might have overdosed.

---

[1] *In re Urosevic/Johnson Minors*, unpublished order of the Court of Appeals, entered November 26, 2025 (Docket Nos. 376905 and 378262).

-1-

One officer went to the house to continue the welfare check. Through the window, he observed SDJ and SLJ, both of whom were only six and a half years of age at the time. They were in their underwear and only one was wearing a shirt. The children let the officer into the home. They reported that they had cooked for themselves. They told the officer that respondent-mother was upstairs and would not wake up despite them shaking her and dousing her with water. The officer located respondent-mother and was able to wake her up by shaking and calling out to her. She woke slowly and was torpid. Drug paraphernalia was scattered throughout the room and was within reach of the children. Respondent-mother denied using any substances, however. She claimed that she was just sleeping. She noted that TLU was at school, but was unable to provide a reason why SLJ and SDJ were absent from school. At the time, respondent-mother had left TLU in the primary care of his father and was not in consistent contact with him.

The officers left the children in respondents' care but advised respondents that Child Protective Services (CPS) would be at the house later that same day. Upon receiving the complaint, a CPS investigator went to respondents' house. Although there were vehicles in the driveway, there was no response when he knocked on the door. The investigator called respondent-mother, who reported that the children were "okay" but that they were not at home. She refused to provide their location. Despite agreeing to meet with the investigator on the following day, respondent-mother was not at the house when he arrived. When he checked back in the evening, no one answered the door. Looking through the window, the investigator could see a hypodermic needle and a crushed blue pill on the dining room table. The items would be within the reach of any children in the home.

Several days later, the investigator was able to interview SDJ and SLJ at school. During the interview, one child reported that respondent-mother "used secret shots." The "secret shots" were kept in respondent-mother's bathroom and respondent-mother was always sleepy after using the shots. The child added that respondent-father "took pills." She described respondents as sleeping for long periods of times, locking them out of the bedroom when they used "the secret shots and pills," and leaving them to prepare their own meals and put themselves to bed. They could not identify any particular activities that they did with respondents and stated that they would "miss school." The investigator tried to speak with respondents the evening after he spoke to the children, but the blinds of the windows were drawn, and paper was covering the windows.

Eventually, respondents appeared at a family team meeting. They denied substance abuse but ultimately agreed that SDJ and SLJ would be placed with their great aunt as part of a safety plan. TLU was living with his father at the time and remained in his care. Respondents submitted to drug screens, and both tested positive for multiple substances. Petitioner, the Department of Health and Human Services, later filed a petition seeking to terminate respondents' parental rights, alleging that respondents' substance abuse had created an unsafe environment for the children and that they had failed to provide the children with proper care and support.

The petition was authorized, and a bench trial was held on jurisdiction. Following the trial, the court found statutory grounds to take jurisdiction over the children. At a subsequent dispositional hearing, however, the court declined to terminate respondents' parental rights. Supervised parenting time was reinstated. Respondents were provided with a parent-agency plan that included substance abuse assessments, inpatient and outpatient substance abuse, bi-weekly drug screens, parenting classes, a psychological evaluation, and supportive visitation.

Respondents were also to stay in contact with their caseworkers, provide proof of legal income, maintain suitable housing, and refrain from criminal activity.

Respondents complied with a few services periodically, attended some parenting time visits, and submitted to some drug screens. However, the hearing referee eventually recommended that petitioner file a supplemental petition for termination, noting that respondents continued to test positive for cocaine and fentanyl and to miss drug screens. The referee also noted ongoing issues related to their housing and income. On review, the trial court agreed with the hearing referee's recommendation. Thereafter, a supplemental petition to terminate respondents' parental rights was filed. Before a hearing on the petition was held, respondent-father received a prison sentence for a probation violation. Respondent-mother also faced incarceration.

Following a hearing on the petition, the trial court found that there was clear and convincing evidence of statutory grounds to terminate respondents' parental rights and found by a preponderance of the evidence that termination of respondents' parental rights was in the children's best interests. This appeal follows.

## II. STATUTORY GROUNDS

### A. STANDARD OF REVIEW

Respondents argue that the trial court erred by finding clear and convincing evidence of statutory grounds to terminate their parental rights. "This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). Clear error exists if this Court is left with a definite and firm conviction that the trial court made a mistake. *Id*. at 709-710.

### B. ANALYSIS

Termination of parental rights is warranted under MCL 712A.19b(3)(c)(*i*) if more than 182 days have passed since the initial dispositional order, the conditions leading to the adjudication continue to exist, and there is no reasonable likelihood that the conditions will be remedied in a reasonable amount of time. It is undisputed that more than 182 days have elapsed since the initial dispositional order.

Additionally, the conditions that led to adjudication—respondents' substance abuse and failure to provide proper care to the children—continued to exist. Respondent-father missed 18 out of 47 offered parenting time sessions. At the sessions that he did attend, he struggled to remain present with the children. At times he appeared to be falling asleep during the visits and at other times he brought up inappropriate issues related to the case or his drug use. Respondent-mother likewise would bring up inappropriate topics during parenting time visits. She missed 13 of the 47 visits, including the Saturday before the termination hearing. Some of the missed parenting time visits was due to respondents' decision to take a vacation to the Bahamas.

Respondents also missed numerous drug screens despite being informed that missed screens would count as positive screens. Some of the drug screens were missed because of respondents' vacation.

With regard to respondent-mother, between August 2023 and January 2024, she missed all 16 drug screens that were offered. Between January 2024 and March 2024, she missed an additional 16 screens. In addition, she tested positive for fentanyl, cocaine, and buprenorphine in January 2024. Respondent-mother admitted that she struggled with substance abuse, and she eventually began to consistently attend her therapy sessions. A caseworker testified that respondent-mother was showing a short-term benefit from the therapy but noted that respondent-mother had previously been provided substance-abuse therapy in connection with earlier removals of the children from her care. In those prior instances, the children were returned to her care, and respondent-mother would again begin abusing substances. In light of that history, the caseworker was not confident that respondent-mother's progress was indicative of long-term success. The caseworker further noted the negative impact that respondent-mother's substance abuse had on her ability to parent her children, which was reflected by the fact that the children had to cook for themselves, put themselves to bed, had access to drug paraphernalia, and would miss school.

With regard to respondent-father, the record reflects that he began attending substance-abuse therapy in April 2024, but was terminated approximately a month later for failure to attend. He did not acknowledge any issues with substance abuse. Like respondent-mother, he did not participate in any drug screens until January 2024. After that, he missed 13 or 14 screens. He also tested positive for cocaine four times and fentanyl seven times. He demonstrated the same lack of parenting ability as respondent-mother did when he was abusing substances.

Considered as a whole, respondents' substance-abuse issues continued throughout the pendency of the case. They both tested positive for illicit substances or were presumed to be positive by virtue of missing their drug screens. Respondent-father participated in therapy to rectify his substance-abuse issues for approximately one month. Respondent-mother participated longer and appeared to show a short-term benefit given that she, unlike respondent-father, acknowledged having a problem. However, TLU, SDJ, and SLJ had been removed from respondent-mother's care multiple times as a result of substance abuse. In each instance, based upon the apparent progress in addressing the substance-abuse issues, the children were returned. At the time of the instant proceedings, SDJ and SLJ were only six and a half years old. Respondent-mother had already demonstrated on two prior occasions that any benefit from her therapy was short-lived and would result in a relapse. Despite that history, she began the instant case with denials of substance abuse, consistently missed drug screens, and then sporadically missed screens. Her later progress toward reunification does not negate the entire history of her substance abuse. Likewise, respondent-father has a tortured history of substance abuse, of showing benefit from services, and of then relapsing. Despite that history, he was unable to even acknowledge a substance-abuse problem during the long pendency of this case, to continue his substance-abuse therapy, or to prioritize sobriety and parenting time for his children. Given the record, the trial court did not clearly err by finding that the conditions that led to adjudication continued to exist and that there was not a reasonable probability that the conditions could be cured in a reasonable time considering the tender ages of the children.[2]

---

[2] Because only one statutory ground is needed, we do not consider the other statutory grounds argued by respondents. *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013).

## III. BEST INTERESTS

## A. STANDARD OF REVIEW

Respondents argue that termination of their parental rights was not in the children's best interests. We review for clear error the court's finding that termination is in a child's best interests. *White*, 303 Mich App at 713.

## B. ANALYSIS

When determining if termination is in a child's best interests, the trial court may consider the bond between the child and the respondent, the respondent's parenting ability, the child's need for stability and permanency, and the advantages of the child's current placement over their parent's home. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). The trial court may also consider respondents' compliance with their service plan, visitation history with the child, the child's well-being in their current placement, and the potential for adoption. *White*, 303 Mich App at 714. When a child is placed with a relative, this weighs against termination of parental rights but is not dispositive. *In re Atchley*, 341 Mich App 332, 347; 990 NW2d 685 (2022). The trial court may also consider the preference of the child if they are a sufficient age to have a preference. *In re Medina*, 317 Mich App 219, 238-239; 894 NW2d 653 (2016).

Respondent-father argues that termination was not proper because he was trying to obtain sobriety, had sufficient income to support his children, and because his children wanted to be reunified with him. We disagree. Although there is evidence of a bond between respondent-father and his children, it was not a particularly strong bond, and his children expressed negative feelings about him. Further, although they expressed a preference to live with respondents, that preference was based upon respondents being substance-free. As noted above, respondent-father continued to struggle with substance abuse. He did not consistently engage in the services to rectify that condition. The children's need for safety, stability, and permanence were jeopardized by respondent-father's substance abuse. Again, they had been removed from his care on two prior occasions due to substance abuse. The third removal occurred when they were only six and a half years of age. In contrast to an uncertain future with respondent-father, the children were thriving in the care of their great-aunt, who was willing to adopt them. Respondent-father's conduct during parenting times, his inconsistent attendance at parenting times, and his parenting ability during those sessions further demonstrate that the children's best interests are served by termination of his parental rights.

Respondent-father suggests that the children's placement with their great-aunt should have weighed against termination and that a guardianship should have been considered. The court, however, expressly found that termination was in the children's best interests despite their placement with their great-aunt. Further, the record reflects that guardianship was considered but was determined to not be appropriate. The children's great-aunt was not willing to serve as a guardian, so the children would have had to be moved to a new placement if they entered a guardianship. That would cause further instability. Because of the previous removals, the caseworker emphasized the importance of permanency for the twins, which a guardianship would not provide. In light of the foregoing, the trial court did not clearly err by finding that termination of respondent-father's parental rights was in SLJ and SDJ's best interests.

Nor did the court err by finding that termination of respondent-mother's parental rights was in the best interests of TLU, SLJ, and SDJ. The court considered the separate interests of the children. TLU did not have a bond with respondent-mother and that he did not want to be returned to her care. And, although SDJ and SLJ had a bond with respondent-mother, and wanted to be returned to her care, the record reflects that she was unable to meet their need for safety, stability, and permanence. With respect to each child, respondent-mother's continued chronic substance abuse problems weighed against a finding that reunification with her was in their best interests. TLU had been removed for substance-abuse issues on three occasions, and had been returned when she appeared to have ameliorated her substance abuse issues. SLJ and SDJ had been removed and returned twice under the same circumstances. As indicated above, respondent-mother's substance abuse prevented her from providing the children with proper care and custody. Thus, the children's need for safety, stability, and permanence was reasonably unlikely to be met if returned to her care. Each child received that safety, stability, and permanence while in the care of their great-aunt, who was willing to adopt the children. And, again, the trial court expressly found that, despite the relative placement, termination of respondent-mother's parental rights was still in each child's best interests. That is, the fact that the children were placed with a relative was outweighed by respondent-mother's consistent failure to demonstrate that she could maintain sobriety, inconsistent attendance at parenting time sessions, her eventual incarceration, and her demonstrated inability to provide stability. Given this record, the trial court did not clearly err in finding that termination of respondent-mother's parental rights was in the children's best interests.

Affirmed.

/s/ Michael F. Gadola
/s/ Christopher M. Murray
/s/ Michael J. Kelly