*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ROSA HOLLIDAY,

        Plaintiff,

v

BOARD OF STATE CANVASSERS,

        Defendant,

and

CORNEL WEST FOR PRESIDENT 2024,
CORNEL WEST, and MELINA ABDULLAH,

        Intervening Defendants.

FOR PUBLICATION
August 30, 2024
9:05 a.m.

No. 372267

Before: M. J. KELLY, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

In this expedited[1] original action related to intervenor Cornel West's attempts to appear on this state's ballot as an independent candidate in the upcoming 2024 presidential election, plaintiff seeks a writ of mandamus against defendant Board of State Canvassers (the "Board") directing it to comply with its alleged "clear legal duty" to investigate the genuineness of certain petition-circulator signatures under MCL 168.552(8) ("If the board of state canvassers receives a sworn complaint, in writing, questioning . . . the genuineness of the signature of the circulator . . . , the board of state canvassers *shall* commence an investigation.") (emphasis added). In addition, plaintiff asks that the Board be ordered to "vacate" its prior determination that West's "qualifying

---

[1] *Holliday v Bd of State Canvassers*, unpublished order of the Court of Appeals, entered August 29, 2024 (Docket No. 372267).

-1-

petitions"[2] were sufficient for him to be certified as a candidate on the ballot by the Secretary of State. Finally, plaintiff asks that the Board be directed to complete its not-yet-started investigation into "the alleged circulator signature forgery . . . *before* deciding," for a second time, whether West's qualifying petitions are sufficient. (Emphasis added.)

To summarize our ruling at the outset, we grant plaintiff a writ of mandamus with regard to the first of her requests, but deny relief as to the second and third requests because they are improperly raised in this particular type of legal action. We have considered and agree with the Board's arguments in many respects, including its argument that it has significant discretion concerning the methods it employs to investigate allegations of signature fraud.[3] We also agree with the Board that it would be inappropriate for this Court to try to tell the Board how, exactly, it should go about investigating allegations of signature fraud. Nevertheless, because the Board concedes that it has not yet completed the investigation into whether the challenged circulator signatures are genuine, we agree with plaintiff that she is entitled to a writ directing the Board to comply with its clear legal duty to commence such an investigation under MCL 168.552(8). In our estimation, this is proper because courts *can* use mandamus to order a public officer or agency to "exercise" discretion when that officer or agent is required to do so—that is, to make *a* decision when there is a clear legal obligation to do so (e.g., when a statute requires that a decision be made). See *Teasel v Dep't of Mental Health*, 419 Mich 390, 409-410; 355 NW2d 75 (1984) ("Mandamus is an extraordinary remedy and will not lie to control the exercise or direction of the discretion to be exercised. Moreover, it will not lie for the purpose of reviewing, revising, or controlling the exercise of discretion reposed in administrative bodies. However, the writ will lie to require a body or an officer charged with a duty to take action in the matter, notwithstanding the fact that the execution of that duty may involve some measure of discretion. Stated otherwise, mandamus will lie to compel the exercise of discretion, but not to compel its exercise in a particular manner.") (citations and footnotes omitted). But because a court *cannot* use mandamus to compel the impossible or to effectively take control of other branches of the government by ordering public officers and administrative agencies *how* to exercise their discretion—i.e., how they should go about doing things that they (not the courts) have a legal duty to do, how quickly they ought to be able to accomplish things, what their ultimate decision ought to be, etc.—we believe it would be improper to order the Board to vacate its prior decision regarding the sufficiency of West's petitions, to instruct the Board to investigate the challenged circulator signatures in any particular manner, or to specify a certain timeframe in which the Board is required to complete its investigation. See *id*.; *City of Benton Harbor v St Joseph & BH St Ry Co*, 102 Mich 386, 391; 60 NW 758 (1894) ("[N]o principle of law is better settled than that the writ should not be granted in any case when it is clear that it would prove unavailing; as where the act sought to be enforced is,

---

[2] The parties agree that, to run as an independent candidate for the presidency in this state, West was required to and did timely file such petitions under MCL 168.590c. For the instant purposes, " 'qualifying petition' means a nominating petition required of and filed by a person to qualify to appear on an election ballot as a candidate for office without political party affiliation." See MCL 168.590(1). In other words, although "qualifying petitions" are not necessarily the same thing as "nominating petitions" under Michigan election law, as used in this opinion, the two phrases are functionally synonymous.

[3] See generally *Johnson v Bd of State Canvassers*, 341 Mich App 671; 991 NW2d 840 (2022).

from its very nature, physically impossible, or where, from extrinsic causes, it has become so, or where performance, though not absolutely impossible, is from any cause not within the power of defendant. But whatever the ground may be, whenever it is apparent that the defendant is unable to perform the act sought to be enforced, the writ, as a general rule, will be denied[.]") (quotation marks and citations omitted).

Given the important interests at stake in this case, we wish to be especially clear about what our ruling here does mean—and what it does not. We do not overturn the Board's decision that West's petitions were sufficient for him to be certified for inclusion on the ballot. Indeed, after careful consideration of the relevant statutes, we view the Board's duty to "investigate" plaintiff's complaint about the *circulator* signatures as distinct from the Board's general duties to "canvass" the *elector* signatures appearing on the qualifying petitions and its related duty to "make an official declaration of the sufficiency or insufficiency of the qualifying petition at least 60 days before the election."[4] We also do not rule that the Board is required to investigate the genuineness of the challenged circulator signatures in any particular way or within any set timeframe. Rather, we hold that the Board is required to perform an investigation into the genuineness of the challenged circulator signatures, and we leave all of the details concerning that investigation to the sound judgment and expertise of the involved staff, Board members, and officers.

## I. FACTUAL BACKGROUND

For purposes of the instant analysis, the operative facts are largely undisputed. The parties agree that, under Michigan's statutory election laws as modified by a federal injunction,[5] to appear as an independent presidential candidate in this state on the November 2024 ballot, West was required to file qualifying petitions including, among other things, the signatures of at least 12,000 electors (i.e., registered voters). The parties also agree that West timely filed qualifying petitions purportedly containing 26,934 valid elector signatures—more than double the number required.

After West's qualifying petitions were filed,[6] plaintiff filed a written complaint with the Board pursuant to MCL 168.552(8) and MCL 168.590f(1). In that complaint, plaintiff challenged the validity and genuineness of myriad elector signatures, and he also raised such challenges to the signatures of certain circulators who had signed a number of West's petitions

The parties further agree that, under established administrative protocols and the supervision of Director of Elections Jonathan Brater (the "Director," or "Brater"), staff of the

---

[4] See MCL 168.552(8); MCL 168.590f(1) & (2).

[5] See *Graveline v Benson*, 430 F Supp 3d 297, 318 (ED Mich, 2019), aff'd 992 F3d 524 (CA 6, 2021).

[6] The Board does not contend, nor does our review of the record tend to suggest, that the complaint was untimely filed for purposes of triggering the Board's duty to investigate under MCL 168.552(8) ("The board of state canvassers is not required to act on a complaint respecting the validity and genuineness of signatures on a petition . . . unless the complaint is received by the board of state canvassers within 7 days after the deadline for filing the nominating petitions.").

Bureau of Elections (the "Bureau")[7] proceeded to canvass (i.e., to examine or scrutinize[8]) the *elector* signatures on the disputed petitions, as required under MCL 168.552(8) ("Upon the receipt of the nominating petitions, the board of state canvassers shall canvass the petitions to ascertain if the petitions have been signed by the requisite number of qualified and registered *electors*.") (emphasis added).[9] In doing so, the staff employed a preestablished statistical-sampling approach using a random sample of 750 signatures, as opposed to reviewing what the Board describes— aptly, given the number of signatures submitted by West—as the total "universe" of the elector signatures on his qualifying petitions. Notably, however, because the issues at bar regard the genuineness of the challenged *circulator* signatures, not a direct[10] challenge to the authenticity of the *elector* signatures themselves, the details of the statistical-sampling approach employed by the Bureau staff are largely immaterial here.

After canvassing the elector signatures, the Bureau staff issued its August 20, 2024 report recommending that the Board deem West's petitions sufficient for his inclusion on the ballot. See MCL 168.590f(2) ("The board of state canvassers shall canvass a qualifying petition filed with the secretary of state and shall make an official declaration of the sufficiency or insufficiency of the qualifying petition at least 60 days before the election."). The report explained that, based on the canvass of the selected sample and principles of statistical probability, "[t]he confidence factor that the projected number of valid signatures [wa]s sufficient [wa]s 99.9%." Notably, the staff report also explained:

---

[7] MCL 168.32(1) provides:

> In the office of the secretary of state, the bureau of elections created by former 1951 PA 65 continues under the supervision of a director of elections, to be appointed by the secretary of state under civil service regulations. The director of elections shall be vested with the powers and shall perform the duties of the secretary of state under his or her supervision, with respect to the supervision and administration of the election laws. The director of elections shall be a nonmember secretary of the state board of canvassers.

[8] See *Black's Law Dictionary* (12th ed.).

[9] See also MCL 168.590f (providing that, except as otherwise specified in that section, the provisions of MCL 168.552 "are applicable to a qualifying petition, a person filing a qualifying petition, and an officer receiving a qualifying petition").

[10] Plaintiff does argue that the invalidity of a given circulator's signatures should result in the invalidation of all elector signatures on all of the petitions purportedly submitted by that circulator, thereby raising a sort of indirect challenge to many of the elector signatures. But because plaintiff has not requested a writ of mandamus directing the Board to take any further action canvassing the elector signatures directly, we need not discuss the statistical-sampling methodology in any real depth here.

On August 16, 2024, the Secretary of State disqualified Cornel West as a candidate for U.S. President on the basis that his affidavit of identity failed to contain a proper notarization. This determination is made by the filing official (the Secretary of State) and is separate from the question of whether a candidate's petitions contain a sufficient number of valid signatures (determined by the Board of State Canvassers, after reviewing the staff report presented to the Board by the Bureau of Elections).

Typically, once the Secretary of State determines a candidate is disqualified based on the contents of their affidavit of identity, the Bureau of Elections does not present a staff report regarding the validity of petition signatures to the Board. However, in this case the Bureau recommends that the Board review the validity of petition signatures for the following reasons. First, as of the date of publishing this staff report, there is active litigation regarding the Secretary's determination, including a court hearing scheduled on Friday, August 23. Second, this determination will affect all ballots in the state, and it is critical for the administration of the November Election that statewide ballot contents be finalized as early as possible. Third, in the event that the Court does reverse the affidavit of identity disqualification, there might be little time to reconvene the Board and review the petitions in time for ballot contents to be finalized.

The referenced litigation concerning the Secretary of State's disqualification of West based on his affidavit of identity (AOI) took place in three consolidated actions before the Court of Claims, and we are cognizant that expedited claims of appeal from the Court of Claims's final order in those cases were decided by a different panel of this Court just earlier today.[11] Given the time constraints at play, we have not yet had an opportunity to review that panel's decision and are unwilling to delay our decision in this case to do so. Regardless, for the reasons explained in our analysis, *infra*, we are confident that, no matter the ultimate outcome of those other pending appeals, they will have no bearing on the outcome here.

In any event, six days after the staff report was issued, the Board held its August 26, 2024 hearing. As concisely summarized by the Board in its brief here:

At its meeting on August 26, 2024, the Board of State Canvassers considered Holliday's and Barnes' challenges to West's qualifying petitions. During the meeting, the Board heard comments from counsel for both challengers [i.e., plaintiff and another individual who had filed a complaint challenging signatures on West's qualifying petitions], as well as counsel for West. Counsel for the challengers explained their challenges and were given opportunities to answer questions from the Board. Similarly, West's counsel responded to the arguments raised by the challengers and answered questions from the Board.

---

[11] See Court of Appeals Docket Nos. 372255, 372256, 372241.

One of the arguments raised by the challengers was that some of the circulator signatures were fraudulent, including sheets signed by out-of-state circulators. The challengers also alleged that many elector signatures were fraudulent as well. The challengers asked the Board to delay their determination of the sufficiency of West's petition and conduct further investigation into the validity of the circulators' signatures.

The Board considered and debated these requests. Some members expressed concerns that the additional investigation required creating a new process for validating circulator signatures in a short period of time. . . .

The Board spent several hours discussing these and other issues. During this discussion, *the Bureau explained that it does not verify the genuineness of circulator signatures*, but it does ensure that circulator signatures appear on petitions. *Director of Elections Jonathan Brater explained that the Bureau does not have a process in place for investigating whether an out-of-state circulator's signature is genuine.* That is because, as [the] Bureau Regulatory Manager . . . explained earlier in the discussion, the signatures of out-of-state circulators will not be found in Michigan's list of registered electors (the qualified voter file or QVF). Neither would in-state circulators who are not registered to vote. As a result, there may not be signatures for each circulator in Michigan's qualified voter file to review. Several of West's petition circulators were from different states, making the challenges to circulator signature validity virtually impossible for the Board to review.

\* \* \*

After several hours of consideration, the Board voted 3-1 to accept the staff recommendation and found the qualifying petition filed by Cornel West sufficient. [Footnotes omitted; emphasis added.]

In reaction, plaintiff filed her instant complaint in this Court seeking a writ of mandamus, accompanied by a motion for immediate consideration. After the Board filed its answer to the complaint, this Court granted leave to intervene to West, his prospective vice president, Melina Abdullah, and his campaign committee (collectively, "West" in the remainder of this opinion), and we accepted West's proposed answer to the complaint.

As a result of the parties' diligence and willingness to comply with a *severely* shortened briefing period, by midday yesterday, August 29—i.e., a mere three days after the Board's meeting—we were able to order that this matter be submitted to this panel immediately for expedited decision without oral argument.

## II. ANALYSIS

As explained more thoroughly below, because the Board concedes that it has not yet completed an investigation into whether the challenged circulator signatures are genuine, we agree with plaintiff that she is entitled to a writ of mandamus directing the Board to comply with its clear legal duty under MCL 168.552(8) to begin such an investigation. But in all other respects, we

deny plaintiff's requested mandamus relief as an improper request for us to interfere with the Board's exercise of discretion regarding *how* to perform its investigation.

We begin with a discussion of essential legal concepts regarding mandamus. "Mandamus is a discretionary writ and an extraordinary remedy." *Committee to Ban Fracking in Mich v Bd of State Canvassers*, 335 Mich App 384, 394; 966 NW2d 742 (2021) (*Fracking*). "The writ is one of grace," and "equitable principles" apply. *Franchise Realty Interstate Corp v Detroit*, 368 Mich 276, 279; 118 NW2d 258 (1962) (*Franchise Realty*). When deciding whether to issue a writ of mandamus, a court should consider the "germane conditions existing *at the time of hearing and determination* rather than at the time of institution of the proceeding[.]" *Franchise Realty*, 368 Mich at 279-280 (emphasis added). "The primary purpose of the writ of mandamus is to enforce duties created by law, where the law has established no specific remedy and where, in justice and good government, there should be one." *State Bd of Ed v Houghton Lake Community Sch*, 430 Mich 658, 667; 425 NW2d 80 (1988).

As this Court observed in *Rental Props Owners Ass'n of Kent Co v Kent Co Treas*, 308 Mich App 498, 518; 866 NW2d 817 (2014):

> To obtain the extraordinary remedy of a writ of mandamus, the plaintiff must show that: (1) the plaintiff has a clear, legal right to performance of the specific duty sought, (2) the defendant has a clear legal duty to perform, (3) the act is ministerial, and (4) no other adequate legal or equitable remedy exists that might achieve the same result.

For these purposes, "a clear, legal right is one clearly founded in, or granted by, law; a right which is inferable as a matter of law from uncontroverted facts *regardless of the difficulty of the legal question to be decided*." *Id*. at 519 (emphasis added). On the other hand, "[a] ministerial act is one in which the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Hillsdale Co Senior Servs, Inc v Hillsdale Co*, 494 Mich 46, 58 n 11; 832 NW2d 728 (2013) (*Hillsdale*).

Despite the "ministerial act" requirement, mandamus "*will* lie to require a body or an officer charged with a duty to take action in the matter, notwithstanding the fact that the execution of that duty may involve some measure of discretion." *Teasel*, 419 Mich at 410 (emphasis added). "Stated otherwise, mandamus will lie to compel the exercise of discretion, but not to compel its exercise in a particular manner." *Id*. The writ is not a means "of reviewing, revising, or controlling the exercise of discretion reposed in administrative bodies." *Id*.

"The plaintiff bears the burden of demonstrating entitlement" to the requested writ, *Citizens for Protection of Marriage v Bd of State Canvassers*, 263 Mich App 487, 492; 688 NW2d 538 (2004), and the plaintiff also bears the burden of producing sufficient record evidence in support— provided that the truthfulness of the relevant factual allegations has not been conceded by the defendant, *In re Rupert*, 205 Mich App 474, 478-479; 517 NW2d 794 (1994). Mandamus "will not lie to compel a public officer to perform a duty dependent upon disputed and doubtful facts." *Powers v Dignan*, 309 Mich 530, 533; 16 NW2d 62 (1944).

"[T]he issuance of the writ . . . is not a matter of right[.]" *MacKinnon v Auditor General*, 130 Mich 552, 556; 90 NW 329 (1902). In other words, mandamus is described as a "discretionary" writ because, even if the plaintiff establishes a prima facie case of entitlement to the writ, the court nevertheless has discretion to deny relief for various prudential reasons (e.g., if granting the writ is contrary to the public interest, will work an injustice, etc.). See, e.g., *New York Mtg Co v Secretary of State*, 150 Mich 197, 205; 114 NW 82, 84 (1907).

This matter requires us to construe several statutory provisions as a matter of first impression. As our Supreme Court explained in *Sun Valley Foods Co v Ward*, 460 Mich 230, 236-237; 596 NW2d 119 (1999):

> The rules of statutory construction are well established. The foremost rule, and our primary task in construing a statute, is to discern and give effect to the intent of the Legislature. This task begins by examining the language of the statute itself. The words of a statute provide the most reliable evidence of its intent[.] If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. No further judicial construction is required or permitted. Only where the statutory language is ambiguous may a court properly go beyond the words of the statute to ascertain legislative intent.
>
> In interpreting the statute at issue, we consider both the plain meaning of the critical word or phrase as well as its placement and purpose in the statutory scheme. As far as possible, effect should be given to every phrase, clause, and word in the statute. [Quotation marks and citations omitted.]

"A provision of a statute is ambiguous only if it irreconcilably conflicts with another provision or is equally susceptible to more than a single meaning." *Bedford Pub Sch v Bedford Ed Ass'n MEA/NEA*, 305 Mich App 558, 565; 853 NW2d 452 (2014).

As this Court explained in *O'Connell v Dir of Elections*, 316 Mich App 91, 98-99; 891 NW2d 240 (2016):

> Judicial interpretation of statutes should construe an act as a whole to harmonize its provisions and carry out the purpose of the Legislature. When there is tension, or even conflict, between sections of a statute, this Court has a duty to, if reasonably possible, construe them both so as to give meaning to each; that is, to harmonize them. If the provisions of a statute cannot be entirely harmonized without some violation of the rules of statutory interpretation, the Court should adopt the interpretation that does the least damage to what otherwise appears to be plain language in the statute. Statutes that relate to the same subject or that share a common purpose are *in pari materia* and must be read together as one law, even if they contain no reference to one another and were enacted on different dates. The object of the *in pari materia* rule is to give effect to the legislative intent expressed in harmonious statutes. [Quotation marks, citations, and ellipsis omitted.]

In pertinent part, MCL 168.552 provides:

(8) Upon the filing of nominating petitions with the secretary of state, the secretary of state shall notify the board of state canvassers within 5 days after the last day for filing the petitions. . . . Upon the receipt of the nominating petitions, the board of state canvassers shall *canvass* the petitions to ascertain if the petitions have been *signed by the requisite number of qualified and registered* **electors**. Subject to subsection (13), for the purpose of determining the validity of the signatures, the board of state canvassers *may* cause a doubtful signature to be checked against the qualified voter file or the registration records by the clerk of a political subdivision in which the petitions were circulated. *If the board of state canvassers receives a sworn complaint, in writing, questioning the registration of or the genuineness of the signature of* **the circulator or of** *a person signing a nominating petition filed with the secretary of state, the board of state canvassers* **shall** *commence an* **investigation**. Subject to subsection (13), the board of state canvassers *shall* verify the registration or the genuineness of a signature *as required by subsection (13). If the board is unable to verify the genuineness of a signature on a petition*, the board shall cause the petition to be forwarded to the proper city clerk or township clerk to compare the signatures on the petition with the signatures on the registration record, **or** *in* **some other manner** *determine whether the signatures on the petition are valid and genuine*. . . .

\* \* \*

(9) The board of state canvassers *may* hold a hearing upon a complaint filed or for a purpose considered necessary by the board of state canvassers *to conduct an investigation of the petitions*. In conducting a hearing, the board of state canvassers *may issue subpoenas and administer oaths*. The board of state canvassers may also adjourn periodically awaiting receipt of returns from investigations that are being made or for other necessary purposes, but shall complete the *canvass* not less than 9 weeks before the primary election at which candidates are to be nominated. Before making a final determination, the board of state canvassers *may* consider any deficiency found on the face of the petition that does not require verification against data maintained in the qualified voter file or in the voter registration files maintained by a city or township clerk.

\* \* \*

(13) The qualified voter file *may* be used to determine the validity of petition signatures by verifying the *registration* of signers. . . . The qualified voter file *shall* be used to determine the *genuineness of a signature* on a petition. *Signature comparisons shall be made with the digitized signatures in the qualified voter file*. The county clerk or the board of state canvassers *shall conduct the signature comparison using digitized signatures contained in the qualified voter file for their respective investigations*. If the qualified voter file does not contain a digitized signature of an *elector*, the city or the township clerk shall compare the petition signature to the signature contained on the master card. [Emphasis added.]

On the other hand, MCL 168.590f provides:

(1) Except as provided in subsections (2) and (3), sections *544c,* 545, *552,* 553, 555, 556, and 558 are applicable to a qualifying petition, a person filing a qualifying petition, and an officer receiving a qualifying petition.

(2) The board of state canvassers *shall **canvass*** a qualifying petition filed with the secretary of state and *shall make an official declaration of the sufficiency or insufficiency of the qualifying petition at least 60 days before the election. A hearing under this subsection by the board of state canvassers shall be held as provided in section 552.*

(3) A filing officer who receives a qualifying petition from a candidate who has met the requirements of this act shall certify to the proper board or boards of election commissioners the candidate's name, post office address, and office sought. If the election for the office is held at the general election, the filing officer shall make the certification not later than 60 days before the general election.

In turn, the referenced § 544c, MCL 168.544c, provides (in relevant part):

(2) The petition must be in a form providing a space for the circulator and each elector who signs the petition to print his or her name. . . . The failure of the circulator or an elector who signs the petition to print his or her name, to print his or her name in the location prescribed by the secretary of state, or to enter a zip code or his or her correct zip code does not affect the validity of the signature of the circulator or the elector who signs the petition.

(3) If the circulator of a petition under . . . section 590b(4)[12] . . . is not a resident of this state, the circulator *shall* indicate where provided on the certificate of circulator that *he or she agrees to accept the jurisdiction of this state for the purpose of any legal proceeding or hearing* initiated under section 476, *552, 590f(2),* or 6854 that concerns a petition sheet executed by the circulator *and agrees that legal process served on the secretary of state or a designated agent of the secretary of state has the same effect as if personally served on the circulator.*

(4) If the secretary of state or a designated agent of the secretary of state is served with legal process as described in subsection (3), *the secretary of state shall*

---

[12] The qualifying petitions in this case were petitions under § 590b(4) because they regarded West's candidacy for the presidency. See MCL 168.590b(4) (listing "a qualifying petition for the office of president of the United States, United States senator, governor, attorney general, secretary of state, state board of education, board of regents of the university of Michigan, board of trustees of Michigan state university, board of governors of Wayne state university, or justice of the supreme court").

-10-

*promptly notify the circulator by personal service or certified mail at the circulator's residential address as indicated in the certificate of circulator.*

(5) The circulator of a petition shall sign and date the certificate of circulator before the petition is filed. . . .

* * *

(8) An *individual* shall not do any of the following:

(a) *Sign a petition with a name other than his or her own.*

(b) Make a false statement in a certificate on a petition.

(c) *If not a circulator, sign a petition as a circulator.*

(d) *Sign a name as circulator other than his or her own.*

(9) Except as otherwise provided in subsection (10), *an individual who violates subsection (8) is guilty of a misdemeanor punishable by a fine of not more than $500.00 or imprisonment for not more than 93 days, or both.*

(10) *An individual shall not sign a petition with multiple names. An individual who violates this subsection is guilty of a felony.*

(11) If after a canvass *and a hearing on a petition under section 476 or 552* the board of state canvassers determines that an individual has knowingly and intentionally failed to comply with subsection (8) or (10), the board of state canvassers *may* impose 1 or more of the following sanctions:

(a) Disqualify obviously fraudulent signatures on a petition form on which the violation of subsection (8) or (10) occurred, without checking the signatures against local registration records.

(b) *Disqualify from the ballot a candidate who committed, aided or abetted, or knowingly allowed the violation of subsection (8) or (10) on a petition to nominate that candidate.*

(12) If an individual violates subsection (8) or (10) and the affected petition sheet is filed, each of the following who knew of the violation of subsection (8) or (10) before the filing of the affected petition sheet and who failed to report the violation to the secretary of state, the filing official, if different, the attorney general, a law enforcement officer, or the county prosecuting attorney is *guilty of a misdemeanor, punishable by a fine of not more than $500.00 or imprisonment for not more than 1 year, or both*:

(a) The *circulator* of the petition, *if different than the individual who violated subsection (8) or (10).*

\* \* \*

(13) If after a canvass *and a hearing on a petition under section 476 or 552* the board of state canvassers determines that an individual has violated subsection (12), the board of state canvassers *may* impose 1 or more of the following sanctions:

(a) Impose on the organization or other person sponsoring the petition drive an administrative fine of not more than $5,000.00.

(b) Charge the organization or other person sponsoring the petition drive for the costs of canvassing a petition form on which a violation of subsection (8) or (10) occurred.

(c) *Disqualify an organization or other person described in subdivision (a) from collecting signatures on a petition for a period of not more than 4 years.*

(d) Disqualify obviously fraudulent signatures on a petition form on which a violation of subsection (8) or (10) occurred without checking the signatures against local registration records.

(e) *Disqualify from the ballot a candidate who committed, aided or abetted, or knowingly allowed a violation of subsection (8) or (10) on a petition to nominate that candidate.*

(14) *If an individual refuses to comply with a subpoena of the board of state canvassers in an investigation of an alleged violation of subsection (8), (10), or (12), the board* **may** *hold the canvass of the petitions in abeyance until the individual complies.*

(15) A person who aids or abets another in an act that is prohibited by this section is guilty of that act.

(16) *The provisions of this section except as otherwise expressly provided apply to* **all petitions circulated under authority of the election law**. [Emphasis added.]

We believe that the emphasized language in those several statutory quotations makes several things plain. As previously noted, although plaintiff's arguments sometimes conflate the concepts, we view the Board's duty to "investigate" plaintiff's complaint about the disputed circulator signatures as distinct from the Board's general duties to "canvass" qualifying-petition signatures and its related duty to "make an official declaration of the sufficiency or insufficiency of the qualifying petition at least 60 days before the election." It also bears note that, throughout the relevant statutes, the Legislature has made an obvious choice to make some of the Board's actions optional (by stating that the Board "may" do a thing), while at other times making actions mandatory (by stating that the Board "shall" do a thing). As already explained, mandamus is not a proper vehicle to force the Board to choose to do any of those discretionary/optional things, nor will it compel the Board to perform discretionary *aspects* of its otherwise mandatory duties, at least in any particular way. In our view, the duty under MCL 168.552(8) to "commence an

investigation" into allegations of fraudulent circulator signatures falls into that latter class of hybrid duties; it is an initially mandatory duty, but after the investigation is commenced, its performance entails the exercise of substantial discretion. Put differently, although the Board does have a clear legal duty to commence such an investigation—provided that a written complaint meeting all of the statutory requirements is timely filed—the Legislature has afforded it considerable discretion concerning the options that it "may" choose in deciding how to do so and the sanctions that it "may" impose as a result of what it discovers.

In light of the statutory language, we perceive no basis for concluding that such an investigation must, as plaintiff insists, be conducted and concluded *before* the deadline for the Board to make its formal declaration of the sufficiency of disputed petitions. Because the challenger's prime focus in these cases is the removal of a rival or a disliked candidate from the ballot, the parties have largely focused on noncertification as the only possible rationale for the Board to commence an investigation into allegedly forged signatures, ignoring the other potential results that an investigation might yield. Indeed, plaintiff's myopic focus on that result strongly suggests that it is her only true objective in this action. But as the Board correctly recognizes:

> Even if this Court were to conclude that the Board had a duty to investigate the circulator signatures further, that would not necessarily lead to the conclusion that West's petitions could not be determined sufficient. There is a subtle but important distinction between a duty to investigate the circulators' signatures and whether the Board would determine that West's petitions are sufficient. [Plaintiff] is assuming that alleged "forgery" of the circulators' signatures would result in the insufficiency of the petition, but that is not necessarily so.

The Board goes on to correctly note that, in addition to uncovering evidence that might potentially lead the Board to change its mind about whether to deem the disputed petitions sufficient, or prompt it to decide to impose various sanctions against electors and others involved in West's campaign, an investigation into the alleged signature fraud in this case might ultimately lead to criminal charges being lodged against those found to have been involved. See generally MCL 168.544c. Given those potential outcomes, which are entirely unrelated to the distinct question of whether West's name ultimately appears on the ballot,[13] and given the seeming lack of any statutory language expressly providing that the Board must conclude its investigation before the applicable 60-day deadline for it to render its "official declaration" as to the sufficiency of the petitions,[14] we see no rational basis for concluding that the Board *does* have an affirmative legal duty to perform its entire investigation within such the tightly circumscribed timeframe that

---

[13] For instance, it takes little imagination to conceive of a scenario under which an investigation into one isolated circulator's obvious commission of signature fraud, involving a relatively limited number of petitions, might leave a candidate with more than enough valid elector signatures to be certified on the ballot, while nevertheless yielding evidence that might result in a slew of sanctions against an elector or others, such as disqualification of the fraudulent elector in future election cycles, and/or criminal prosecutions.

[14] See MCL 168.590f(2).

-13-

plaintiff suggests. Indeed, reading the various sections of the Act in harmony, we hold that the opposite is true. Plaintiff's suggested interpretation of the statutes would force us to reach the conclusion that the Legislature chose to charge the Board with the mandatory duty of investigating serious allegations of criminal conduct involving our elections, while simultaneously intending that, in the event the Board is unable to finish its investigation in time for it to impact the given candidate's appearance on the ballot, the Board lacks any authority to follow through with its investigation and should instead let any forgers go free.[15]

Nor are we persuaded by the Board's contention that it is impotent to investigate the genuineness of the signatures of out-of-state circulators, lacking any true means to do so. That argument fails to recognize the above-quoted provisions of MCL 168.544c. Under MCL 168.544c(3), out-of-state circulators handling qualifying petitions for presidential candidates are required to effectively provide this state's official with a signature exemplar—they are obliged to sign and file a "certificate of circulator[.]" And by doing so, the circulator agrees to accept personal jurisdiction in this state for enforcement of the relevant elections laws, further agreeing that service of process on the Secretary of State will be the functional equivalent of personal service on the circulator. See MCL 168.544c(3) & (4). Furthermore, given the subpoena powers granted to the Board at least twice in the relevant statutes—and the discretion under MCL 168.544c to "hold the canvass of the petitions in abeyance until" a recalcitrant circulator complies with such a subpoena, thereby at least potentially jeopardizing the related candidate's opportunity to appear on the ballot at all—it seems that the Board would have a significant clout in trying to coerce circulators and candidates into assisting its investigatory efforts. That said, we again emphasize that we do not note these things to suggest that the Board should—or should not—exercise its discretion to employ such tactics in this case or any other. Quite the contrary. We take no position whatsoever with regard to how the Board *ought* to exercise its discretion. Instead, we make such observations as a means of explaining why we believe the issuance of a writ of mandamus is not precluded in this case on grounds that it would be impossible for the Board to comply.

We also disagree with the Board's syllogistic argument that because the signatures of out-of-state circulators will naturally not appear (at least in the *vast* majority of instances[16]) in this state's qualified voter file (QVF) or in the voter registration files maintained by municipal clerk, and "MCL 168.552(8) provides that signature verification is to be performed using the QVF and registration records," it necessarily follows that the Board has no clear legal duty to "commence" an investigation under MCL 168.552(8). Put differently, the Board's argument is that, because it is "virtually impossible for the Board to review" challenges to the authenticity of certain circulator signatures—or at least, to do so using the methods purportedly mandated under MCL 168.552(8)

---

[15] For those same basic reasons, we reject the Board's contentions that, so long as the given candidate has enough valid elector signatures to be certified as a candidate, the Board is excused from its duty to investigate allegations of circulator-signature fraud in a written complaint that is duly filed under MCL 168.552(8). In our estimation, there is no textual support for that position.

[16] In theory, limited exceptions to this general rule would be possible—e.g., the signature of a former Michigan resident who was a registered voter here, and who has recently moved to another state while continuing to serve as an elector here, might remain in the QVF and/or the files maintained by the city and township clerks.

-14-

& (13)—the Board cannot have a clear legal duty to even *try*. Reviewing MCL 168.552(8) & (13) in isolation without any consideration of their statutory context, the Board's argument has initial logical appeal. But under closer inspection, its flaws become apparent. As we have already explained, MCL 168.552(8) specifically *requires* the Board to commence an investigation into properly challenged circulator signatures—with no stated exception for out-of-state circulators. On the other hand, by setting forth certain specific requirements applicable to out-of-state circulators, MCL 168.544c(3) clearly acknowledges that circulators of qualifying petitions like those at issue here need not be "a resident of this state[.]" Thus, the Board's proposed interpretation would create clear disharmony within this legislative scheme; it would effectively render the relevant portion of MCL 168.552(8), which set forth the duty to commence an investigation to challenged circulator signatures, nugatory as applied in cases like this. The Board's argument also depends on the unstated presupposition that the Legislature simply made a mistake in this area, failing to fully recognize the consequences of the pertinent amendment to MCL 168.544c that was wrought by 2014 PA 418 (i.e., the amendment in which the Legislature first acknowledged that a circulator of petitions like those in this case need not be a resident of this state). Clearly, that presupposition is contrary to the well-recognized canons that the Legislature is presumed to know the existing law, to legislate in harmony with it, and to understand the consequences of its enactments within the overall statutory context. See *In re Medina*, 317 Mich App 219, 227-228; 894 NW2d 653 (2016).

The Board is correct that MCL 168.552(8) clearly provides that "the board of state canvassers shall verify the registration or the genuineness of a signature as required by subsection (13)," which in turn provides (in pertinent part):

> The qualified voter file *shall* be used to determine the genuineness of a signature on a petition. Signature comparisons *shall* be made with the digitized signatures in the qualified voter file. The county clerk or the board of state canvassers *shall* conduct the signature comparison using digitized signatures contained in the qualified voter file for their respective investigations. If the qualified voter file does not contain a digitized signature of an elector, the city or the township clerk *shall* compare the petition signature to the signature contained on the master card. [MCL 168.552(13) (emphasis added).]

But the Legislature has also expressly recognized that there may be situations, such as this one, when that normally mandatory process is not possible. In relevant part, MCL 168.552(8) also provides:

> If the board is *unable* to verify the genuineness of a signature on a petition, the board shall cause the petition to be forwarded to the proper city clerk or township clerk to compare the signatures on the petition with the signatures on the registration record, *or in some other manner determine whether the signatures on the petition are valid and genuine*. [Emphasis added.]

By reading that provision as an authorization for the Board to use "some" manner other than utilizing the QVF and municipal voting records when investigating the genuineness of the signatures of out-of-state circulators, one harmonizes the provisions at issue here while continuing to give meaning to all of the relevant text. And that is particularly true given our earlier conclusion

that, contrary to the Board's arguments, it does, in fact, have methods by which it could attempt to investigate such signatures despite their lack of inclusion in the QVF or municipal voter files. Put differently, rather than presupposing that the Legislature made an error in judgment, as the Board's interpretation does, the interpretation we adopt today presumes that the Legislature did not do so— that it knew, when enacting 2014 PA 418, that the enactment would spawn no conflict between MCL 168.544c and MCL 168.552(8) because, when investigating the genuineness of the signatures of out-of-state circulators, the Board would not be required to go through a fundamentally futile process—trying to use this state's voting records to find signature exemplars for nonresidents. Once again, we do not intend to suggest that the Board should or must employ the potential methodology discussed in this opinion. Instead, we merely note the feasibility of such a methodology as a means of explaining our reasoning on the discrete issues raised here.

As a final consideration, we note that, in their filings, the parties have focused almost exclusively on the second, third, and fourth elements for mandamus—namely, whether defendant has a clear legal duty to perform; if so, whether the acts to be compelled are ministerial or instead involve the exercise of discretion; and regardless, whether plaintiff has some adequate alternative remedy. Plaintiff barely addresses the first element—i.e., whether she has a clear legal right to performance of the actions she seeks to compel. Because plaintiff bears the burden of demonstrating her entitlement to the requested writ, see *Citizens for Protection of Marriage*, 263 Mich App at 492, and she has not adequately briefed this particular issue, this Court could technically refuse to award her any of her requested relief, particularly in light of the discretionary nature of mandamus. Nevertheless, we are well aware of binding precedent indicating that plaintiff *is* entitled, as a registered Michigan voter, to vindicate the public's clear legal rights in the strict enforcement of election laws. See *Berry v Garrett*, 316 Mich App 37, 50-51; 890 NW2d 882 (2016). If the plaintiff in *Berry* was entitled to vindicate such rights in a case involving putative candidates for "the positions of township trustee and township supervisor," it stands to reason that plaintiff Holliday can do the same in this action involving a prospective candidate for the highest executive office in our nation.

III.  CONCLUSION

For the reasons explained above, we grant in part and deny in part plaintiff's request for a writ of mandamus. The Board is hereby directed to duly comply with its legal duty to commence an investigation into the challenged circulator signatures under MCL 168.552(8), though we leave all of the discretionary details concerning that investigation to the sound administrative judgment and expertise of the Board. In all other respects, we hold that plaintiff is not entitled to the mandamus relief she requests.

This opinion constitutes our final judgment in this case, see MCR 7.215(E)(1), and this judgment shall have immediate effect pursuant to MCR 7.215(F)(2). No taxable costs are awarded given that no party has prevailed in full. See MCR 7.219(A).

/s/ Michael J. Kelly
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly

-16-