*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* J. L. HOYT, Minor.

UNPUBLISHED
February 20, 2025
10:52 AM

No. 370823
St. Joseph Circuit Court
Family Division
LC No. 2022-000942-NA

Before: GARRETT, P.J., and RICK and MARIANI, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating his parental rights to the minor child, JLH, pursuant to MCL 712A.19b(3)(j) (reasonable likelihood of harm to the child if returned to the parent). We affirm.

## I. BACKGROUND

In December 2022, the Department of Health and Human Services (DHHS) filed a petition requesting that the trial court take jurisdiction over JLH and remove her from respondent's care.[1] DHHS alleged that respondent regularly physically abused and emotionally controlled JLH's mother, particularly as it related to JLH's feeding and care, while in JLH's presence, and the domestic violence had been severe and ongoing since before JLH's birth in October 2022. DHHS alleged that a particularly severe domestic-violence incident occurred in JLH's presence in November 2022, during which respondent had repeatedly assaulted JLH's mother with his fists, a belt, and a knife, leaving her with a black eye, swelling and bruises all over her body, a cut, and a stab wound requiring stitches. Immediately thereafter, respondent was arrested and charged with four counts of felonious assault and two counts of aggravated domestic violence. A no-contact order was also issued between respondent and JLH's mother, but following respondent's release from jail, respondent and JLH's mother repeatedly violated the no-contact order. Following a

---

[1] JLH's mother was also a respondent in this case, and her parental rights to JLH were also terminated by the trial court's order, but she is not involved in this appeal.

preliminary hearing, the trial court authorized the petition, removed JLH from her parents' care and placed her in protective care,[2] and granted respondent supervised parenting time.

The trial court conducted a pretrial hearing a few weeks later, and respondent pleaded to the allegations in the petition and to the court's exercise of jurisdiction under MCL 712A.2(b)(2) (unfitness of parental home). Respondent admitted to ongoing domestic violence in JLH's presence as detailed in the petition and admitted that it was contrary to JLH's welfare to live in such an environment. The trial court accepted respondent's pleas, exercised jurisdiction, continued respondent's supervised parenting time, and ordered DHHS to engage in reasonable efforts toward reunification. DHHS created a case service plan, which the trial court adopted. The court ordered respondent to comply with his case service plan and to participate in and benefit from domestic-violence services, anger-management services, mental-health services, substance-abuse treatment, and parenting education. The trial court also ordered respondent to complete a psychological evaluation and follow all recommendations from that evaluation, submit to random drug screenings, and obtain and maintain suitable housing, transportation, and a legal source of income.

In January 2023, DHHS filed an ex-parte motion to suspend respondent's parenting time. DHHS alleged that shortly after JLH was placed with her maternal uncle, the placement's home burned down "under suspicious circumstances." JLH's mother later admitted to the police that she set the house on fire and was criminally charged as a result, but she reported to the investigating officer that she only committed the arson because respondent directed her to "burn down the house or kill everyone inside" and then "leave [JLH] in the house and anonymously call police after she had killed everybody else." DHHS asked that the court suspend all parenting time because, given the admissions of JLH's mother, "it would be extremely dangerous to allow her or [respondent to] have parenting time with [JLH] at this time." The same day, the trial court issued an ex-parte order granting DHHS's motion and suspending all parenting time. Respondent objected to the order and a hearing was held in February 2023 to further address the matter, but after hearing additional testimony from a CPS investigator, the trial court continued the suspension of respondent's parenting time "[t]o safeguard the minor child and her foster placement[.]"

Throughout the proceedings, respondent made minimal progress in addressing his domestic-violence issues, which DHHS considered to be the primary barrier to reunification. In August 2023, respondent pleaded no contest to one count of aggravated domestic violence in exchange for dismissal of the remaining felonious-assault and aggravated-domestic-violence charges, and he was thereafter incarcerated for approximately two months until his release on November 6, 2023. Additionally, although respondent completed a psychological evaluation and participated in some counseling and self-guided parenting education, he struggled with obtaining and maintaining suitable housing and employment and failed to consistently participate in anger-management and domestic-violence services. During the review hearings, the caseworker acknowledged that respondent's lack of participation in one domestic-violence program was due to no fault of his own, noting that both she and respondent struggled to communicate with the program about available services for months, but she indicated that she had referred respondent to

---

[2] JLH was initially placed in a nonrelative foster home, but she was moved to a relative placement with her maternal uncle a few weeks later. JLH remained in a relative placement until termination.

other programs for domestic-violence services and provided him with information regarding other available resources before, during, and after this time. The trial court also reconsidered the suspension of respondent's parenting time at each review hearing, but based on DHHS's court reports submitted as evidence, testimony at each hearing indicating that respondent had not substantially addressed his domestic-violence issues, and DHHS's recommendations that respondent show two to three months of consistency and progress in addressing his domestic-violence issues before supervised parenting time was reinstated, the court continually found that even supervised parenting time presented a risk of harm to JLH and ordered that respondent's parenting time remain suspended.

In December 2023, DHHS filed a supplemental petition requesting termination of respondent's parental rights under MCL 712A.19b(3)(j). At the termination hearing in April 2024,[3] respondent's caseworker testified that DHHS provided numerous services to respondent and although respondent participated in some of them, including some counseling and parenting education, respondent had not overcome his barriers to reunification. The caseworker testified that respondent still had not obtained suitable housing or employment, and domestic violence was still "a very significant barrier" to reunification because respondent minimally participated in and had not demonstrated any benefit from the domestic-violence services. Both the caseworker and the officer who investigated the November 2022 domestic-violence incident testified that the domestic violence had been severe and ongoing, and it involved physical abuse and extremely controlling behavior. The officer testified that the November 2022 incident was a particularly severe case of domestic violence, noting that respondent had repeatedly threatened and beaten JLH's mother with his fists and a belt over the course of a day and later pinned her against a wall and stabbed her.[4] Respondent also displayed extreme control over JLH's mother and JLH's care, and the officer testified that JLH's mother had reported that respondent required JLH's mother to be on the phone with him "at pretty much all points of the day," would not allow her to leave the home without a chaperone, and would not allow her to breastfeed or prepare formula for JLH. The officer testified that respondent had initially denied the assault and stated that he had "blacked out," and respondent admitted at the termination hearing that he had lied to the officer about not remembering the assault because he "didn't want to talk to him." Respondent testified that he had acted in self-defense when he repeatedly struck and stabbed JLH's mother because she was trying to attack him with a knife, but the investigating officer testified that respondent did not "have any marks or injuries or abrasions on him." Moreover, following the incident, respondent and JLH's mother repeatedly had contact with one another despite the no-contact order that was in place at that time. Respondent also testified that he later pleaded no contest to one count of aggravated domestic violence in August 2023 and, as a result, was incarcerated until November 6, 2023.

The caseworker further testified that respondent "seem[ed] receptive" to attending domestic-violence services, but he also adamantly refused to attend domestic-violence services at the Kalamazoo Probation Enhancement Program (KPEP) where he was first referred. Respondent

---

[3] The termination hearing was originally scheduled to take place in February 2024, but due to unforeseen circumstances, respondent's attorney was unable to attend the hearing, and it was rescheduled for April 2024.

[4] Photographs of the resulting injuries of JLH's mother were also provided to the court as evidence.

was then referred to Domestic and Sexual Abuse Services (DASAS), but neither respondent nor the caseworker had success contacting DASAS about services or funding for the services, so the caseworker again referred respondent to KPEP for services. Respondent, however, continued to refuse to engage with KPEP. The caseworker also provided respondent with resources regarding possible self-funded services in Paw Paw. The caseworker referred respondent to the Domestic Violence Coalition (DVC) in Paw Paw for services following his release from jail in November 2023 and informed him that DHHS could not provide funding for this particular program. Respondent testified that he had no issue with paying for the services and had reliable transportation from his mother. Despite this, respondent did not begin attending the services until February 2024. The caseworker testified that at the time of the termination hearing, respondent had only completed approximately five weeks of the 17-week program, and although the program employees reported that he participated in the sessions, they also reported that he had not yet demonstrated any benefit from the program. Respondent testified that he had been working on domestic-violence and anger-management packets previously provided to him by his case manager until he began the in-person services but that he still had not completed the packets. The caseworker also testified that counseling and anger-management services were important for respondent to address his domestic-violence issues, but respondent inconsistently participated in both throughout the case and had not participated in either since January 2024, even though weekly participation had been strongly recommended. Respondent's parenting time was suspended entirely in January 2023 because it presented a substantial risk of harm to JLH's safety and well-being as well as to the safety of the relative placement and the DHHS employees supervising parenting times. The caseworker testified that respondent had also been previously investigated by CPS in 2016 for a claim that he had abused his child from a previous relationship, and CPS substantiated the abuse claim after determining that respondent had used inappropriate physical discipline on the child.

There was also significant testimony regarding the January 2023 arson of the home in which JLH was placed. The officer testified that, during an interview shortly after the arson occurred, JLH's mother admitted to committing the arson, but she explained that she only did so because respondent had threatened her and directed her to "kill the whole family and leave [JLH] there and call the police . . . after the fact" so that they could regain custody of JLH. JLH's mother further explained that she bought "some camp fuel," drove over to the placement's home, and set it on fire all "while [respondent] was on the phone with her kind of giving her direction on what to do" and "how to carry out the act." During his testimony, respondent denied any involvement in the arson. During her testimony, JLH's mother recanted her previous statements to the police and testified that she was not under respondent's direction or influence when she committed the arson, explaining that she only claimed respondent was involved because she "was upset" about "everything that was going on." She also testified, however, that she "blacked out" during the arson and had "no memory" of what she did or who she talked to from shortly before the arson "until after the arson was completed." She also testified that during her prior interview about the arson, she reported to the officer that she was being "completely honest" about her description of events, "including the fact that [respondent] was involved," and the officer testified that JLH's mother spoke very "freely" with him about the arson during the interview.

The caseworker testified that termination was in JLH's best interests because JLH had been placed with her maternal uncle nearly her entire life, it was harmful to return JLH to respondent's care, and respondent had not demonstrated that he could provide JLH with the safety, stability,

and permanence that she needed. The caseworker also testified that given her age and how long respondent's parenting time had been suspended, JLH did not have a bond with respondent and was unlikely to recognize him as her father. Conversely, JLH was bonded with her maternal uncle and thriving in his home, and JLH's uncle expressed interest in adopting JLH. The caseworker noted that although JLH was in a relative placement, she still believed that termination was in JLH's best interests because respondent had done little to address his domestic-violence issues and she did not believe that, even if given additional time, he would overcome those barriers.

At the close of proofs, the referee made findings of fact and conclusions of law recommending that the trial court terminate respondent's parental rights. The referee first concluded that DHHS had established grounds for termination under MCL 712A.19b(3)(j) by clear and convincing evidence. The referee found that there was a reasonable likelihood that JLH would be harmed if returned to respondent's care because there was still "a lot of problems with domestic violence in this case." The referee noted that there was significant evidence that respondent was physically abusive and controlling and that, although respondent had recently started participating in domestic-violence and anger-management services, he had not demonstrated benefit from them. The referee emphasized that the circumstances surrounding the arson of the home of JLH's relative placement were "pretty tragic" and, when considered with the other evidence regarding domestic violence throughout this case, demonstrated that there was still a substantial risk of harm to JLH's safety and well-being. The referee acknowledged that testimony from the officer and JLH's mother regarding respondent's involvement in the arson conflicted, but it did not find the testimony of JLH's mother recanting her prior statements about respondent's involvement with the arson to be "credible at all," particularly given the significant amount of evidence regarding respondent's physical abuse and control over her. The referee also noted that respondent had a substantiated claim of child abuse in 2016 and, when considering this with the other evidence presented, the referee believed that respondent had "the capacity to do this again[.]"

The referee next found that, for many of the same reasons, DHHS had established by a preponderance of the evidence that termination was in JLH's best interests due to her young age and her need for safety, stability, and permanency. The referee emphasized that there was a minimal bond between JLH and respondent given that respondent's parenting time had been suspended for over a year but that JLH had a very strong bond with her relative placement and was "thriving" in his home. The referee also noted that JLH's relative placement indicated that he intended to adopt JLH if this case resulted in termination. The referee considered JLH's relative placement but found that termination was still in her best interests because JLH and her placement had already been "victimized" by respondent and JLH's mother during this case and would only continue to live in fear of "what could happen" and "what may happen" to them in the future. The trial court thereafter adopted the referee's findings and conclusions and issued an order terminating respondent's parental rights to JLH in April 2023. This appeal followed.

II. SUSPENSION OF RESPONDENT'S PARENTING TIME

Respondent argues the trial court erred by suspending his parenting time without making the requisite finding of harm. We disagree.

A. STANDARDS OF REVIEW

We review a trial court's decision to modify or suspend parenting time for an abuse of discretion. *In re Laster*, 303 Mich App 485, 490-491; 845 NW2d 540 (2013), superseded by statute on other grounds as recognized by *In re Ott*, 344 Mich App 723, 738-741; 2 NW3d 120 (2022). A trial court abuses its discretion when it selects an outcome that falls outside the range of principled outcomes. *In re COH*, 495 Mich 184, 202; 848 NW2d 107 (2014). A trial court also abuses its discretion when it makes an error of law. *In re Piland*, 336 Mich App 713, 720; 972 NW2d 269 (2021). We review a trial court's factual findings underlying the legal issues for clear error. *In re McCarrick/Lamoreaux (On Remand)*, 307 Mich App 436, 463; 861 NW2d 303 (2014). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Miller*, ___Mich App ___, ___; ___NW3d ___ (2023) (Docket No. 364195); slip op at 2 (quotation marks and citation omitted). "We review de novo the interpretation and application of statutes and court rules. De novo review means we do not extend any deference to the trial court." *Ott*, 344 Mich App at 735 (citations omitted).

## B. ANALYSIS

A respondent-parent is entitled to parenting time with his or her child even after removal of the child from his or her care unless the trial court suspends parenting time. *Id*. at 737-743; see also MCL 712A.13a(13); MCL 712A.18(1)(p). A trial court may only suspend parenting time if it determines that "parenting time, even if supervised, may be harmful to the juvenile's life, physical health, or mental well-being." MCL 712A.13a(13); see also *Ott*, 344 Mich App at 741, citing MCL 712A.18(1)(p). If the court makes such a determination, it "may suspend parenting time until the risk of harm no longer exists." MCL 712A.13a(13); MCL 712A.18(1)(p). A trial court has "broad authority" in effectuating orders after it assumes jurisdiction over a child, and although the court's orders "must be 'appropriate for the welfare of the juvenile and society in view of the facts proven and ascertained,' MCL 712A.18(1), the orders are afforded considerable deference on appellate review[.]" *In re Sanders*, 495 Mich 394, 406; 852 NW2d 524 (2014).

According to respondent, the trial court erred by suspending his parenting time without making the requisite finding of harm because the court only based its decision on inadmissible hearsay evidence, which was both improper and inadequate to justify the suspension. Specifically, respondent argues that the court primarily relied on testimony that JLH's mother had admitted to the police that she committed the arson after respondent directed her to do so. That testimony, respondent maintains, was inadmissible, and there was nothing else in the record to support the notion that he was involved in the arson; furthermore, no evidence demonstrated that defendant ever intended to harm JLH or that his parenting time with her should be suspended, let alone for the duration of time that it was. The court, respondent contends, should have only suspended his parenting time after making the necessary finding of risk of harm by at least a preponderance of legally admissible evidence. Instead, the court failed to articulate the risk of harm that even supervised parenting time with respondent presented to JLH, leaving him no path to achieve restoration of his parenting time and unduly destroying his bond with JLH.

We do not find respondent's arguments convincing. To start, respondent's hearsay challenge is misplaced. Although hearsay is generally inadmissible unless the rules of evidence provide otherwise, MRE 802, the rules of evidence do not apply during dispositional review hearings, MCR 3.973(E); MCR 3.975(E). Thus, when determining whether to suspend

respondent's parenting time, the trial court was permitted to consider the out-of-court statements of JLH's mother regardless of whether they constituted hearsay.

Furthermore, the record reflects that the trial court made the requisite finding of harm before suspending respondent's parenting time. The trial court heard testimony from a CPS investigator that the home where JLH was placed had been burned down, that the arson had occurred "right after [respondent's] parenting time," that JLH's mother admitted to the police that she had "burn[ed] down the house" at respondent's direction, and that JLH's mother admitted to the police that the arson was "a plot" between her and respondent "to get the child back by burning down the house or by killing everyone else in the house so that then they could have custody again." The CPS investigator also testified that the fact that respondent "was willing to threaten" or "coerce" JLH's mother into burning down the house of JLH's placement demonstrated his "willingness to commit extreme felonies and/or discuss murder" and indicated that he was "not afraid to risk other people's lives in accomplishing [his] goal of getting [his] child back." The CPS investigator testified that this behavior presented significant "safety concerns even at a supervised visit" because respondent "would be unpredictable at parenting time" and the DHHS employees supervising the parenting times were not equipped to protect themselves or JLH should respondent attempt something so drastic during parenting time.

The court suspended respondent's parenting time after agreeing with the arguments presented by DHHS's counsel and the GAL that it was no longer safe or appropriate for JLH to have even supervised parenting time with respondent. The court then explained its decision, stating that the situation was "a very shocking revelation" and "very, very disturbing," and it found that suspension of respondent's parenting time was appropriate for the welfare of JLH and other individuals involved in this case because, based on the testimony regarding respondent's behavior, even supervised parenting time presented a risk of harm to JLH's physical safety and mental well-being. Thus, the record demonstrates that the trial court did, in fact, make the requisite findings before suspending respondent's parenting time, and the record also adequately supports those findings. See MCL 712A.13a(13); MCL 712A.18(1)(p); *Ott*, 344 Mich App at 741.

As noted, respondent also challenges the trial court's continued suspension of his parenting time throughout the case because "n[o] additional evidence was introduced in future hearings" that he was involved in the arson or had "any intention of harming his child." We first note that the trial court's inquiry when determining whether to suspend parenting time was not whether respondent intended to harm his child, but whether even supervised parenting time "may be harmful to [JLH's] life, physical health, or mental well-being." MCL 712A.13a(13); MCL 712A.18(1)(p). As previously discussed, the trial court made this finding when it first suspended respondent's parenting time. And, as the case progressed, the trial court could continue the suspension of respondent's parenting time "until the risk of harm no longer exist[ed]" if doing so was "appropriate for the welfare of the juvenile and society in view of the facts proven and ascertained." MCL 712A.18(1)(p); MCL 712A.13a(13).

The record reflects that the trial court made these findings at each hearing. The court reconsidered the suspension of respondent's parenting time at every review hearing, during which it received court reports, testimony from respondent's caseworker, and DHHS's recommendations going forward, all of which indicated that even supervised parenting time still presented a risk of harm to JLH and the others involved in this case because respondent had not substantially

-7-

addressed his domestic-violence issues. For instance, although respondent handled his criminal matter related to domestic violence midway through the case as DHHS had requested—which DHHS acknowledged was a good start to addressing his domestic-violence issues—DHHS repeatedly indicated that it felt that it was inappropriate to reinstate parenting time until respondent had shown at least two months of consistency in services or significant progress in addressing his domestic-violence issues given the role that domestic violence played in this case and, more specifically, in the arson of the home in which JLH was placed. While respondent maintains that no additional evidence of his involvement in the arson was submitted beyond the statements of JLH's mother, we fail to see why any such additional evidence would have been necessary on that point, or why its absence would have rendered the court's findings deficient. Nor does the record support respondent's suggestion that it was not sufficiently clear why his parenting time was being suspended and what he fundamentally needed to do to address that suspension. Based on the evidence presented and DHHS's recommendations, the court found after each hearing that the same threat of harm that necessitated the initial suspension of respondent's parenting time still existed and ordered that respondent's parenting time remain suspended. Thus, the record again demonstrates that the trial court made the necessary findings before continuing the suspension of respondents parenting time after each review hearing, and the record adequately supports those findings as well. See MCL 712A.18(1)(p); MCL 712A.13a(13).

In sum, we give "considerable deference" to the trial court's dispositional orders, *Sanders*, 495 Mich at 406, and here, the court made the necessary findings based on the presented evidence before issuing an order suspending or continuing the suspension of respondent's parenting time. We see no legal or factual error in those findings, and no abuse of discretion in the court's decision to suspend respondent's parenting time. *COH*, 495 Mich at 202; *Piland*, 336 Mich App at 720.

### III. TERMINATION OF RESPONDENT'S PARENTAL RIGHTS

Respondent argues that the trial court clearly erred by finding that clear and convincing evidence supported termination of his parental rights under MCL 712A.19b(3)(j) and by finding that termination was in JLH's best interests. We disagree.

### A. STANDARDS OF REVIEW

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). We review for clear error a trial court's finding that a statutory ground for termination of parental rights has been proven by clear and convincing evidence and that termination is in a child's best interests. *In re Lombard*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367714); slip op at 4. A finding is clearly erroneous if, even if some evidence supports the finding, the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *Id.* "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court gives deference to "the special ability of the trial court to judge the credibility of witnesses." *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016) (quotation marks and citation omitted).

## B. STATUTORY GROUNDS FOR TERMINATION

A trial court may terminate parental rights under MCL 712A.19b(3)(j) if it finds by clear and convincing evidence that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent." "The harm contemplated under MCL 712A.19b(3)(j) includes emotional harm as well as physical harm," *In re Sanborn*, 337 Mich App 252, 279; 976 NW2d 44 (2021), and "a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home," *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014).

Sufficient evidence supported the trial court's decision to terminate respondent's parental rights under this statutory ground. Ongoing and severe domestic violence in JLH's presence, to which respondent admitted, initiated this case, and multiple witnesses testified that the domestic violence involved respondent's physical abuse and extreme control of JLH's mother, particularly as it related to JLH's feeding and care. Respondent also admitted to a domestic-violence incident that occurred in November 2022, during which he repeatedly physically assaulted JLH's mother with his fists and a belt and ultimately stabbed her with a knife, and the investigating officer described his investigation and interview with JLH's mother regarding the matter at the termination hearing. Respondent was charged with several assault-related offenses for this incident, and midway through this case, he pleaded no contest to aggravated domestic violence and was incarcerated for approximately two months. Additionally, less than a month after this case began, the home in which JLH had been placed had burned down, and the caseworker and the officer testified that JLH's mother had admitted to committing the arson at respondent's direction. JLH's mother also admitted that respondent instructed her to kill JLH's entire foster family so that she and respondent could regain custody of JLH and that respondent was on the phone with her throughout the whole incident, instructing her on what to buy and how to commit the arson. The caseworker testified that respondent's parenting time in this case was suspended in response to the incident because even unsupervised parenting time posed a risk to JLH's and DHHS employees' safety, and respondent's parenting time was never reestablished during the case because he had not demonstrated any progress in addressing his domestic-violence issues, which was the primary barrier to reunification and had instigated the arson.

Moreover, respondent acknowledged during his testimony that domestic violence was the primary concern throughout the case but that he had not consistently participated in or completed the services meant to address this issue. There is also no dispute that respondent refused to participate in the domestic-violence services to which he was referred at KPEP. The caseworker testified that although respondent recently began participating in domestic-violence services in Paw Paw, respondent had only completed five weeks of the 17-week program, and the employees providing the services reported that respondent had not yet demonstrated any benefit from the program. There was also a substantiated claim of child abuse against respondent after he used inappropriate physical discipline on his young child from a previous relationship in 2016. This evidence showed that there was a reasonable likelihood that JLH would be physically or

emotionally harmed if returned to respondent's care, and the trial court did not clearly err by finding that MCL 712A.19b(3)(j) had been established by clear and convincing evidence.[5]

## C. BEST-INTERESTS DETERMINATION

When determining whether termination is in the best interests of the child, the court should place its "focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). "The trial court should weigh all the evidence available to determine the children's best interests," and it should consider a variety of factors, including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *White*, 303 Mich App at 713 (quotation marks and citation omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child[]'s well-being while in care, and the possibility of adoption." *Id*. at 714. "The trial court may also consider how long the child was in foster care or placed with relatives, along with the likelihood that the child could be returned to the parents' home within the foreseeable future, if at all." *In re Mota*, 334 Mich App 300, 321; 964 NW2d 881 (2020) (quotation marks, citation, and alteration omitted).

Respondent's only challenge on appeal to the trial court's findings regarding JLH's best interests is that it was improper for the court to rely on his minimal bond with JLH because the lack of bond was a result of the court's erroneous suspension of his parenting time throughout the case. As already explained, however, the trial court did not abuse its discretion by suspending or continuing the suspension of respondent's parenting time in this case. In any event, the record clearly reflects that the trial court relied on more than just the minimal bond between JLH and respondent when makings its best-interests determination. The court found that returning JLH to respondent's care presented a substantial risk of harm to JLH because domestic violence was still a significant issue for respondent, and given that respondent had not resolved his domestic-violence issues and had a substantiated claim of child abuse for using inappropriate physical discipline, it strongly believed that respondent had "the capacity to do this again." The court

---

[5] To the extent that respondent argues that the testimony regarding the statements made by JLH's mother to the officer about respondent's involvement in the arson was inadmissible hearsay and therefore could not be considered at the time of termination, we conclude that, even in the absence of this evidence, there was still sufficient evidence presented from which the trial court could conclude that this statutory ground had been established by clear and convincing evidence. In particular, given the testimony concerning the severity of the November 2022 domestic-violence incident, respondent's no-contest plea to aggravated domestic violence, and the substantiated claim of child abuse against respondent, as well as the testimony that respondent did not obtain adequate housing and employment, minimally participated in the offered services, and did not complete or demonstrate any benefit from his offered services, there was ample evidence in the record to support the trial court's finding that, based on respondent's "conduct or capacity," there was "a reasonable likelihood" that JLH would be harmed if returned to respondent. See MCL 712A.19b(3)(j); see also *Sanborn*, 337 Mich App at 279; *White*, 303 Mich App at 711.

acknowledged that respondent had recently begun participating in domestic-violence services but found that he had not demonstrated sufficient participation in or benefit from the services as to eliminate the risks of harm that would come with returning JLH to his custody. The court also found that JLH had a very strong bond with her relative placement, who expressed interest in adoption, and that even though JLH was placed with a relative, termination was still in her best interests because JLH and her placement would only continue to live in fear of "what may happen" to them in the future. The court found—and the record supports—that respondent could not provide JLH with the safety, stability, and permanence that she needed in her young life, but that JLH's relative placement could provide—and had already provided—for those needs. The record reflects that the trial court properly weighed all the evidence available to it at the time that it made its best-interests determination, *White*, 303 Mich App at 713-714, and we see no clear error in its findings, see *Lombard*, ___ Mich App at ___; slip op at 5-6.[6]

Affirmed.

/s/ Kristina Robinson Garrett
/s/ Michelle M. Rick
/s/ Philip P. Mariani

---

[6] Respondent also makes a cursory argument on appeal that DHHS did not make reasonable efforts toward reunification because it provided him with services for domestic violence rather than for his "capacity to instruct [JLH's mother] to commit arson." "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give issues cursory treatment with little or no citation of supporting authority." *In re Warshefski*, 331 Mich App 83, 87; 951 NW2d 90 (2020) (quotation marks and citation omitted). Because respondent has failed to adequately brief the issue, we decline to address it. See *id*. ("An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue.") (quotation marks and citation omitted). We note, however, that from what we can glean of respondent's argument, we do not see any merit to it.

-11-