*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* B. L. GILLAND, Minor.

UNPUBLISHED
December 11, 2025
9:45 AM

No. 373612
Grand Traverse Circuit Court
Family Division
LC No. 21-004961-NA

Before: KOROBKIN, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Respondent-father appeals by right the termination of his parental rights to his biological child. The court terminated his parental rights more than three years after the child was taken into care, during which the respondent was out of jail for only five months. Throughout that period, respondent's repeated failures to follow through on promises—especially given the child's significant mental-health needs that he was unable to meet—ultimately severed any bond remained between them. Respondent primarily argues, as he did throughout the proceedings, that this case should not have been commenced against him because he delegated his parental authority to his mother, who he now admits was an impermissible placement because she lived with a registered sex offender. We affirm.

## I. BACKGROUND

Before this case began, the child and both parents[1] were living with the child's maternal grandparents. This case began after the mother assaulted the grandmother, and the child tried to intervene. The mother was intoxicated, incoherent, and tested positive for methamphetamine. At the time, respondent was in jail, and he denied knowledge of the domestic violence or of the mother's use of drugs. The maternal grandmother testified that the mother's behavior had been deteriorating for more than half a year at the time of the assault. Respondent was briefly released

---

[1] The child's mother was a respondent, and her parental rights were also terminated, but she is not participating in this appeal. We therefore refer only to the child's father as "respondent."

from jail but rapidly reincarcerated. At that time, he reported that he believed the mother used drugs, and he wanted the child to remain with the maternal grandparents or with his mother until he got back out of jail.

However, respondent did not mention that his mother lived with a registered sex offender, a situation that never changed throughout the case despite her repeated promises that he soon would be moving out. Two weeks *after* petitioner filed its initial petition, respondent executed a delegation of parental authority under MCL 700.5103—which the parties refer to as the "power of attorney" (POA)—delegating his parental responsibility to the paternal grandmother. Notwithstanding the POA, the trial court removed the child from his care, reasoning that respondent either knew of the dangerous conditions in which the child had been living or he was uninvolved in her life.

Respondent previously appealed the removal, arguing, in relevant part, that the trial court erred by removing the child at the preliminary hearing because of the POA. *In re Gilland*, unpublished per curiam opinion of the Court of Appeals, issued May 18, 2023 (Docket No. 363275), p 1 n 1. This Court rejected that argument, holding:

> The crux of respondent's argument on appeal is that the court should not have removed the child from his care because, by the time of the preliminary hearing, he had signed a POA granting his mother authority over the child. See, e.g., *In re Sanders*, 495 Mich 394, 420-421; 852 NW2d 524 (2014) (an incarcerated parent can direct who is to care for his or her child); see also *In re Mason*, 486 Mich 142, 161 n 11; 782 NW2d 747 (2010). However, in *In re MU*, 264 Mich App 270, 278-279; 690 NW2d 495 (2004), this Court explained that the pertinent period for assessing unfitness is "the time the petition was filed."

> Here, at the time the July petition was filed, no POA had been initiated. In addition, respondent had been informed about the child's mother's domestic violence and substance abuse in early June. Subsequently, respondent was released from jail. At that time, notwithstanding that he was not incarcerated, respondent failed to even contact DHHS when asked to do so. He was then incarcerated again. Respondent contends on appeal that it takes time to execute things such as a POA while in jail, but given that he was out of jail for a period, his explanation for the failure to timely execute a POA rings hollow. Under the circumstances of this case, the court did not clearly err by concluding that removal was appropriate. [*In re Gilland*, unpub op at 3.]

This Court denied respondent's request for appellate relief. *Id*. at 4.

Meanwhile, the maternal grandfather died, and the child was removed from the maternal grandmother's care after it was established that she was incapable of keeping the child safe from the mother. Petitioner investigated the paternal grandmother and respondent's cousin as potential relative placements. Petitioner found the paternal grandmother unacceptable because she had a registered sex offender living with her, never took steps towards removing the sex offender from her home, and she minimized the seriousness of the offender's crimes. Petitioner found the cousin unacceptable on the basis that her house was unsafe because of clutter and trash, and she lived next

door to the paternal grandmother, who was effectively the head of both households. Therefore, the child was placed with foster parents who had advanced training in trauma therapy, which the child was found to need desperately.

When the child was first placed with the foster parents, she presented more like a two-year-old than her actual age of seven years old. She had severe post-traumatic stress disorder, displayed a disturbing lack of empathy, did not know how to interact with adults, was violent, and did not even know how to play. But within three months of being placed with the foster parents, she rapidly began presenting more like a normal seven-year-old child and turned out to be a caring and compassionate person, although still with severe mental-health challenges. The child's therapist explained that the child had an exceptionally high need for stable and consistent parenting, had an impaired ability to regulate her own emotions, and vitally needed a caretaker who could identify her triggers and understand her behaviors.

Respondent spent most of the pendency of the case in jail, occasionally being released, making promises that he would improve, and returning to jail. Initially, he had regular telephone calls with the child, which went well but were described as somewhat superficial. The child was already angry with respondent for making promises that he could not keep, but she looked forward to seeing him in person when he was released. However, when she finally received in-person visits with him, they barely interacted, he verbally abused her, and he only showed up to three out of the 27 parenting times he was offered before being returned to jail. The child was severely hurt, traumatized, and ultimately expressed a desire to sever ties to respondent. The child's therapist opined that the child needed extreme consistency, truth and honesty, adults who took accountability when they were wrong, and permanency—which the foster parents could provide. Respondent did not dispute that the foster parents were exceptional people for a child with trauma, but he argued mostly that the trial court should have placed the child with relatives, which would have precluded the court from taking jurisdiction over him at all.

The trial court found that petitioner did make efforts to place the child with relatives, but those relatives "were determined not to be appropriate," that the child did not want a relationship with respondent, and that there was no reasonable likelihood that respondent could overcome his pattern of incarceration and substance abuse within a reasonable time given the child's great need for immediate stability. The trial court noted that respondent could not even care for himself, let alone remain sufficiently free from substances to care for the child's basic needs, and because of the child's trauma, she needed "more than perhaps the average child." The trial court observed that the child was not in a relative placement, but rather "in a loving foster home" where the foster mother could provide not only the child's basic needs, but also provide for the "extremely high needs" of the child. But the child could not make further progress until she knew where she would be placed long term. The trial court therefore found termination in the child's best interests. This appeal followed.

## II. PLACEMENT WITH RELATIVES

Respondent appears to challenge the trial court's assumption of jurisdiction. We disagree.

For the trial court to exercise jurisdiction, it must find a statutory basis for jurisdiction established by a preponderance of the evidence, and we review the trial court's assumption of jurisdiction for clear error in light of its findings of fact. *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004). The trial court assumed jurisdiction as to respondent under MCL 712A.2(b)(1) (failure to provide proper or necessary support or care) and MCL 712A.2(b)(2) (home or environment is unfit because of neglect, cruelty, drunkenness, criminality, or depravity by parent). Respondent challenges those findings on the theory that he did provide proper care and custody to the child by delegating his parental authority to the paternal grandmother. This Court has already rejected that argument.

In respondent's previous appeal, this Court explained that the POA was irrelevant because the touchstone for unfitness was the situation at the time the initial petition was filed, at which time no POA existed. *In re Gilland*, unpub op at 3. This Court did not address the trial court's assumption of jurisdiction because only the child's removal was at issue previously. *Id*. However, the same principle applies here because, for purposes of assuming jurisdiction, the trial court must likewise "examine the child's situation at the time the petition was filed." *In re MU*, 264 Mich App 270, 279; 690 NW2d 495 (2004). In any event, even if we were to accept respondent's argument that the situation should have been considered as of the date of the most-recent petition before the adjudication trial, that would still not help respondent. By the time the most-recent petition had been filed, respondent had executed the POA, but petitioner had already determined that the paternal grandmother and respondent's cousin were unacceptable placements.

In other words, none of respondent's requested relative placements for the child were permissible placements. Under MCL 722.954a, there is a *preference* for placing children with relatives. *In re DMAN*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket Nos. 364518 and 364520); slip op at 8. But MCL 722.954a(2) specifically refers to "placement with a *fit and appropriate* relative *who would meet the child's developmental, emotional, and physical needs*" (emphasis added). The record shows that, even assuming that the trial court erred by failing to consider the situation as it was when the most-recent petition was filed, no such *fit and appropriate* relative existed. Because respondent did not seek to place the child with any *acceptable* relatives, the trial court did not err by declining to order the child placed with any relatives.

## III. BEST INTERESTS

Respondent also argues that the trial court erred by finding that termination was in the child's best interests. We disagree.

The focus of the best-interest analysis is on the child's rights and interests, not the parent's rights and interests. *In re Moss*, 301 Mich App 76, 87-88; 836 NW2d 182 (2013). In making that determination,

the court should consider a wide variety of factors that may include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (footnotes omitted).]

"Under appropriate conditions, a trial court may forego [sic, forgo] termination and instead place a child in a guardianship." *In re Lombard*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367714); slip op at 6.

Respondent correctly observes that, when determining the best interests of a child for termination-of-parental-rights purposes, the trial court *may* also consider the child-custody statutory best-interest factors in MCL 722.23. *In re Medina*, 317 Mich App 219, 238; 894 NW2d 653 (2016). But he offers no reason why the trial court erred by declining to do so here, and he offers no reason why any such consideration would have favored him. Any argument on that basis is abandoned. *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

Respondent also seems to argue that the trial court should have considered the foster parents to be a relative placement under MCL 712A.13a(1)(j)(*ii*), under which a "relative" may include a person with no biological or formal legal relationship to the child "but who has a strong positive emotional tie or role in the child's life," colloquially referred to as "fictive kin." However, the foster parents were strangers to the seven-year-old child and to respondent when the child was placed with them, so they were not "fictive kin." See *In re CJM*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367565); slip op at 1, 5 (determining that the child's caregiver constituted fictive kin because the caregiver cared for the child since birth, the child considered the caregiver to be his mother, and the actual mother requested that the caregiver be the child's guardian prior to the proceedings, indicating a close relationship between them before placement). In this case, the close ties that the child developed with her foster parents *after* placement does not elevate them to "fictive kin." See *id*.

Respondent otherwise offers vague contentions that the trial court failed to consider certain matters. He argues that although he had not overcome his addiction issues that kept returning him to jail, and the child could not live with him until he was recovered, "that doesn't mean she doesn't need love, need, and want her father." In fact, the trial court appropriately considered how deeply and repeatedly hurt the child was by respondent's pattern of failures and false promises that severed any bond they once had. The evidence showed that the child needed permanency, support, and love—all of which respondent was incapable of providing. Respondent downplays his problems as merely "absenting him from her," overlooking the fact that the child was upset, angry, and traumatized by that absence.

Respondent argues that the trial court did not consider whether maintaining parental ties would be in the child's best interests, but the trial court did consider the fact that the child had extreme needs that respondent could not meet, respondent made choices that hurt the child and destroyed their bond, and the child's mental health depended on attaining permanency. The trial

court found, and the record supports, that the child would be harmed if returned to his care, and the record also shows that respondent was harming the child, even in his physical absence. In contrast, the child was thriving in her preadoptive placement. Therefore, we conclude that the trial court did not clearly err by finding that termination was in the child's best interests.

Affirmed.

/s/ Daniel S. Korobkin
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado